VARMA & CLANCY
Attorneys at Law
Bob N. Varma (SBN 173508)
5217 Orchid Ranch Ct.
Elk Grove, CA 95757
tel 916.687.3703
fax 916.687.3706

E-FILING

ADR

FILED

2008 JUN 25 P 2: 33

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

Attorneys for K.P.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

K.P., a minor,
By and Through C.P.,
Her Guardian Ad Litem,

      Plaintiff,

v.

SALINAS UNION HIGH
SCHOOL DISTRICT,
      Defendant.

CASE NO. C 08 03076 HRL

COMPLAINT

[20 U.S.C. § 1415]

NOW COMES Plaintiff K.P. (*hereinafter* "Plaintiff"), a minor by and through C.P., her Guardian Ad Litem, for a complaint against Defendant SALINAS UNION HIGH SCHOOL DISTRICT(*hereinafter* "Defendant") and alleges as follows:

PRELIMINARY STATEMENT

1. This action is brought pursuant to Section 1415(i)(2)(A) of Title 20 of the United States Code, also referred to as the Individuals With Disabilities Education Act (*hereinafter* "IDEA"). (20 U.S.C. §1415(i)(2)(A). *See generally* 20 U.S.C. §§ 1400 *et seq.*). Plaintiff has been aggrieved by a hearing decision rendered by the Office of Administrative Hearings, Special Education Division on or about March 28, 2008.

//

K.P. v. Salinas Union High Sch. Dist.
Case No. Unassigned
Complaint

1    <u>JURISDICTION AND VENUE</u>

2    2.  This action arises under the laws of the United States, (*See* 20 U.S.C. §1415(i)(3)(A),)

3    and the State of California (*See* CAL. EDUC. CODE § 56507(b) & (d).)  Jurisdiction is conferred on

4    this Court pursuant to 28 U.S.C.§1331 and 28 U.S.C. § 1367(a).

5    3.  Venue is proper in this Court under 28 U.S.C. § 1391(b).  Defendant resides within the

6    County of Monterey in the Northern District of California, and all of the events that are the subject

7    of this complaint took place within the Northern District of California.

8    <u>PARTIES</u>

9    4.  Plaintiff is a citizen of the United States.  Plaintiff resides with her parents, in the County

10   of Monterey, within the boundaries of Defendant's educational jurisdiction, and is a student in said

11   Monterey County.  Plaintiff is eligible for special education and related services pursuant to the

12   IDEA, and Sections 56000 et seq. of the California Education Code.

13   5.  The Defendant is a public entity organized and existing under the laws of the State of

14   California, with the capacity to be sued.  The Defendant receives federal funds from the United

15   States Department of Education pursuant to IDEA, and is required to provide a free and appropriate

16   public education (*hereinafter* "FAPE") in the least restrictive environment to all disabled children

17   whose parents reside within the Defendant's educational boundaries.

18   <u>STATUTORY SCHEME UNDER IDEA</u>

19   6.  IDEA (formerly known as the Education For All Handicapped Children Act ("EHCA"),

20   P.L. 94-142) was adopted in 1975 to ensure that all children with qualifying disabilities receive a

21   public school education.  In adopting IDEA, Congress found that "Before the date of enactment of

22   the Education for All Handicapped Children Act of 1975 [citation omitted] the educational needs

23   of millions of children with disabilities were not being fully met . . . ."  (20 U.S.C. § 1400(c)(2).)

24   Enactment of the EHCA has been successful in "ensuring children with disabilities and the families

25   of such children access to a free appropriate public education and in improving educational results

26   for children with disabilities."  (20 U.S.C. § 1400(c)(3).)  However, Congress found that

27

28   <u>K.P. v. Salinas Union High Sch. Dist.</u>
     Case No. Unassigned
     Complaint

1  "implementation of this chapter has been impeded by low expectations, and an insufficient focus on

2  applying replicable research on proven methods of teaching . . . Almost 30 years of research and

3  experience has demonstrated that the education of children with disabilities can be made more

4  effective by . . . having high expectations . . . in order to . . . meet developmental goals and to the

5  maximum extent possible the challenging expectations that have been established for all children

6  . . . and be prepared to lead productive and independent adult lives, to the maximum extent possible."

7  (20 U.S.C. § 1400(c)(4)-(5).)

8      7.  Educational programs for handicapped children are designed and implemented through

9  Individualized Education Programs (*hereinafter* "IEP") which contain, among other things,

10  statements of the following: the child's present levels of educational performances, annual goals and

11  short term objectives, and the specific educational services to be provided to the child and the extent

12  to which the child will be educated in regular education programs.  (20 U.S.C. § 1414(d).)  In

13  addition, Congress required that educational programs for handicapped children be implemented,

14  to the maximum extent appropriate, in the regular educational environment and that no handicapped

15  child be removed to special classes or separate schools, unless, with the use of supplementary aids

16  and services, the child cannot be educated satisfactorily in the regular education environment.  (20

17  U.S.C. § 1412(a)(5).)

18      8.  Pursuant to 20 U.S.C. § 1415(b)(6), whenever a parent disagrees with a proposed

19  individualized education program, for example, the parent may file a complaint with respect to any

20  matter relating to the identification, evaluation, or educational placement of the child, or the

21  provision of a free appropriate public education to the child.  Pursuant to 20 U.S.C. § 1415(f)(1),

22  whenever such a complaint has been received, the parent shall have an opportunity for an impartial

23  due process hearing which shall be conducted by the State education agency.  As required by IDEA,

24  California has established an impartial due process hearing procedure through contract with the

25  California Department of General Services, Office of Administrative Hearings, Special Education

26  Division (*hereinafter* "OAH").

27

28  K.P. v. Salinas Union High Sch. Dist.
Case No. Unassigned
Complaint

## STATEMENT OF RELEVANT FACTS

9. On July 6, 2007, Plaintiff's parents filed a request for due process hearing. Subsequently after obtaining representation and motion work, a third amended request for due process hearing was filed on November 20, 2007.

10. On January 9, 2008, after a pre-hearing conference OAH issued an order that set out the following issues for resolution.

    a.    Did the school district deny Plaintiff a FAPE in the 2005-2006 school year (*hereinafter* "SY") because it developed the July 2005 transition plan, October 25, 2005 and January 31, 2006 IEP without properly considering information from prior assessments and failed to address Plaintiff's deficits in the areas of low cognitive skills, attention problems, social deficits, pragmatic language deficits and safety issues?

    b.    Did the District deny Plaintiff a FAPE in SY 2005-2006, SY 2006-2007 and 2007-2008 because it:

        1.    Placed Plaintiff in a Resource Specialist Program (RSP) classroom that had too many students, and in regular education classes, in which Plaintiff could not obtain an adequate educational benefit due to her cognitive, attention and social skills deficits?

        2.    Failed to provide Plaintiff with accommodations and modifications designed to meet her unique needs, including a trained aide to accompany Plaintiff in her general education classes?

        3.    Failed to develop goals to address Plaintiff's deficits in her adaptive skills related to her self-help and daily living skills?

K.P. v. Salinas Union High Sch. Dist.
Case No. Unassigned
Complaint

Page 4

c.    Did the District deny Plaintiff a FAPE in SY 2006-2007 and SY 2007-2008 because:

    1.    The IEP goals did not address Plaintiff's unique needs in academics, social skills, pragmatic language development and safety?

    2.    The IEP goals were not adequately specific and not measurable?

    3.    The District's goal were not based on Plaintiff's present levels of        performance and her unique needs?

d.    Did the District deny Plaintiff a FAPE in SY 2005-2006 and SY 2006-2007 by modifying Plaintiff's grades, without Parents' permission, to inaccurately indicate that Plaintiff had made educational progress?

e.    For SY 2005-2006, SY 2006-2007 and SY 2007-2008, did the District fail to develop adequate transition plans for Plaintiff as the transition plans were not tailored to Plaintiff's interests or unique need and not designed to adequately prepare Plaintiff for post secondary or a vocational career?

11. An administrative due process hearing was held on January 10-11 and January 14-15, 2008. On March 28, 2008, the Administrative Law Judge (*hereinafter* "ALJ") issued a written decision. A true and correct copy of the decision is attached hereto and made part hereof as Attachment A.

12. The ALJ determined that the District had offered Plaintiff a free, appropriate public education. ALJ denied all of Plaintiff's requested remedies. Plaintiff now appeals from that decision.

## FIRST CAUSE OF ACTION
### (20 U.S.C. §1415)
### (Claim For Relief against DISTRICT)

13. Plaintiff realleges paragraphs 1 through 12, inclusive, as set forth above and incorporates the same as if fully set forth herein.

14. The hearing decision challenged in this action was arbitrary and capricious and disregarded both law and fact specific to the findings that K.P. was offered a free, appropriate public education, that Plaintiff did not prevail upon the issues raised, that the Defendant met its burden of proof, and other errors made by the ALJ in denying or admitting certain evidence or testimony during the course of the proceedings. The ALJ based his decision on findings of fact that were not supported by the evidence. In addition, the ALJ ignored key evidence and testimony. The ALJ failed to apply the proper legal standard to the facts.

15. Plaintiff will suffer grave, and irreparable harm for which no other adequate legal remedy exists if the decision of the ALJ is not set aside and specific findings made that are consistent with the provisions of IDEA, and legal precedent in this jurisdiction.

16. Plaintiff has exhausted all administrative remedies pursuant to 20 U.S.C. §1415.


## PRAYER

WHEREFORE, Plaintiff respectfully prays for the following relief:

1. For an order that the ALJ's decision be set aside,;

2. That specific findings be made that are consistent with the provisions of IDEA, including but not limited to, a finding that the Defendant's placement and services did not offer a free appropriate public education to Plaintiff, and that the transition plan by the Defendant was inappropriate;

3. For reimbursement for Plaintiff's private placement at Riverview School and associated costs, including travel and visitation costs.

K.P. v. Salinas Union High Sch. Dist.
Case No. Unassigned
Complaint

4. For funding for Plaintiff's compensatory education for her private placement at Riverview for SY 2007-2008 and SY 2008-2009.

5. For reasonable attorney fees and costs as a prevailing party in the underlying administrative action pursuant to 20 U.S.C. §1415 and California Education Code § 56507 (d);

6. For reasonable attorney fees and costs in bringing and prosecuting this appeal pursuant to 20 U.S.C. §1415; and

7. For such other equitable relief as this Court may deem just and proper.


Respectfully submitted,
VARMA & CLANCY

Attorneys for Plaintiff, K.P.


Dated: June 24, 2008        By: _____
                                 Bob N. Varma


K.P. v. Salinas Union High Sch. Dist.
Case No. Unassigned
Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT 1**

<u>K.P. v. Salinas Union High Sch. Dist.</u>
Case No. Unassigned
Complaint

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

In the Matter of:

STUDENT,

              Petitioner,

v.

SALINAS UNION HIGH SCHOOL
DISTRICT,

              Respondent.

OAH CASE No. N2007070128

## DECISION

Administrative Law Judge (ALJ) Peter Paul Castillo, Office of Administrative Hearings (OAH), Special Education Division, State of California, heard this matter in Salinas, California on January 10, 11, 14, 15, 28 and 29, 2008.

Bob N. Varma, Attorney at Law, represented Student. Daniel A. Osher, Attorney at Law, represented the Salinas Union High School District (District). Kelli L. Lydon, Attorney at Law, assisted Mr. Osher during the hearing.

Student's Mother was present during the entire hearing. Rita Rispoli was present on January 28 and 29, 2008, to assist Mother. Also present throughout the hearing was Nancy Jones-Powers, District's Director of Special Education and Student Services.

On July 6, 2007, Student filed her request for due process hearing. On November 19, 2007, OAH granted a request to continue the hearing, and permitted Student to file a Third Amended Complaint. On November 20, 2007, Student filed a Third Amended Complaint. At the close of the hearing, the parties requested time for written argument. The parties filed their closing briefs on February 13, 2008, and the matter was submitted that day.

ISSUES[1]

1.     Did the District deny Student a Free Appropriate Public Education (FAPE) in the 2005-2006 school year (SY) because it developed the July 2005 transition plan, October 25, 2005 and January 31, 2006 Individualized Education Programs (IEPs) without properly considering information from prior assessments and failed to address Student's deficits in the areas of low cognitive skills, attention problems, social deficits, pragmatic language deficits and safety issues?

2.     Did the District deny Student a FAPE in SY 2005-2006, SY 2006-2007 and 2007-2008 because it:

> A.     placed Student in a Resource Specialist Program (RSP) classroom that had too many students, and in regular education classes, in which Student could not obtain an adequate educational benefit due to her cognitive, attention and social skills deficits?

> B.     failed to provide Student with accommodations and modifications designed to meet her unique needs, including a trained aide to accompany Student in her general education classes?

> C.     failed to develop goals to address Student's deficits in her adaptive skills related to her self-help and daily living skills?

3.     Did the District deny Student a FAPE in SY 2006-2007 and SY 2007-2008 because:

> A.     the IEP goals did not address Student's unique needs in academics, social skills, pragmatic language development and safety?

> B.     the IEP goals were not adequately specific and not measurable?

> C.     the District's goals were not based on Student's present levels of performance and her unique needs?

4.     Did the District deny Student a FAPE in SY 2005-2006 and SY 2006-2007 by modifying Student's grades, without Parents' permission, to inaccurately indicate that Student had made educational progress?

5.     For SY 2005-2006, SY 2006-2007 and SY 2007-2008, did the District fail to develop adequate transition plans for Student as the transition plans were not tailored to

---

[1] These issues are those framed in the January 9, 2008 Order Following Prehearing Conference. The ALJ has revised the issues without changing their substance, for purposes of organizing this Decision.

2

Student's interests or unique needs and not designed to adequately prepare Student for post-secondary education or a vocational career?

## REQUESTED REMEDIES

Student requests that the District reimburse Parents for her private placement at Riverview School (Riverview) and associated costs, including travel and visitation costs. Student also seeks as compensatory education that the District fund her private placement at Riverview for SY 2007-2008 and SY 2008-2009.

## CONTENTIONS OF THE PARTIES

Student asserts that the District failed to address her unique needs in developing her educational program and placement. For SY 2005-2006, Student contends that the District failed to consider her prior assessments, overestimated her cognitive abilities, and underestimated her pragmatic language, social skills and attention deficits. Student argues that she required more intensive instruction in a smaller classroom setting and that her RSP and general education classes had too many pupils for her to make adequate educational progress. Additionally, Student argues that the District did not address her social skills and safety deficits that prevented her from communicating appropriately with her peers and placed her at risk for being exploited by other students as she did not understand the consequences of her actions. Student further contends that the District failed to develop accommodations and modifications that addressed her unique needs. Student also contends that the District failed to develop goals in the areas of self-help and daily living skills to address her adaptive skills deficits. Moreover, Student asserts that the District inflated her grades to make it appear that she made adequate educational progress. Finally, Student argues that the District's Individual Transition Plan (ITP) was not adequate because the District failed to consider Student's unique needs and interests, and did not develop an ITP to prepare Student for life after high school.

The District contends that it developed and implemented educational programs that were appropriate and permitted Student to receive some educational benefit. The District asserts that it did not have all of Student's educational records when she entered the District, and that the District appropriately modified Student's educational program as the District obtained further information regarding Student's abilities. The District argues that Student's deficits did not prevent her from receiving an adequate educational benefit in general education classes, with a math special education class and resource support. The District contends that the accommodations and modifications, which included additional time to complete homework and tests, preferential seating, and an instructional aide, were sufficient to meet her unique needs. Additionally, the District asserts that Student had more abilities to take care of herself, interact appropriately with others and learn than her Mother, private tutors, and private assessors believed.

3

For SY 2006-2007, Student asserts that the District failed to offer an IEP that met her unique needs, because the District continued to offer the same program she received the prior school year. Student contends that the District continued to fail to address her cognitive, attention, pragmatic language, and social skills deficits by not developing adequate goals, accommodations, and modifications. Student also asserts that the District needed to assign her a full-time aide in and out of class to provide intensive academic instruction and monitor her safety. Additionally, she argues the District failed to address her safety and social skills deficits because she cut school and forged parental excuse notes. Student asserts that the District's goals were not specific enough, and were based upon incorrect present levels of performance that overestimated her abilities. Student again contended that the District inflated her grades and did not develop an adequate ITP. Finally, Student asserts that the District's proposed IEP for SY 2007-2008 had the same flaws as the prior school years as the District failed to modify Student's educational program to meet her unique needs.

The District contends that Student made adequate progress in her freshman and sophomore years with the mix of general education and special education classes, and that the District's goals, accommodations and modifications met her unique needs. The District asserts that Student's program addressed her unique needs due to the provision of an instructional aide during her regular education classes to redirect her if she went off-task and to provide academic assistance. The District contends that Student's unexcused absences were typical conduct of a teenager and that the District addressed Student's conduct through social skills classes, and disciplining her, which led her to understand the consequences of her actions and to work harder in class. The District asserts that it met Student's academic needs by working with her on written expression and organizational skills. As with SY 2005-2006, the District argued that it did not have to develop specific daily living or self-help goals because Student because she did not have unique needs that required these goals as she had greater abilities than her Mother, private tutors, and private assessors claimed.

## FACTUAL FINDINGS

*Background*

1.      Student, born September 20, 1990, lives with her Parents within the District boundaries. The parties agree that Student is eligible for special education services under the category of Speech Disorder. Student attended Salinas High School (SHS) for ninth and tenth grade in SY 2005-2006 and 2006-2007. In September 2007, Parents unilaterally placed Student at Riverview, a private, residential school for learning disabled children, in Massachusetts, where Student presently attends.

2.      Student attended a small, private Montessori school from kindergarten through eighth grade, and was held back a year in third grade. Parents provided Student with an in-class instructional aide, private speech and language therapy, and private tutoring after school. In 2000, Student's prior school district, Washington Union School District

4

(Washington)[2], assessed Student for eligibility for special education services. Washington found Student eligible for special education services under the category of Speech Disorder. Parents declined services from Washington. Parents later requested that Washington assess Student again, and Washington again found Student eligible for special education services in December 2003. Parents did not consent to Washington's offer of placement and services until June 2, 2004.

*Student's Unique Needs at Start of SY 2005-2006*

3.      By the time of the May 25, 2005 IEP meeting for Student's transition to SHS, Student had undergone several public education agency and private assessments. In June 2000, the Monterey County Office of Education (MCOE) conducted a psychoeducational assessment for Washington. The MCOE assessment found that Student had a full scale intelligence quotient (IQ) of 73, which placed Student in the 4th percentile, on the Wechsler Intelligence Scale for Children, Third Edition (WISC-III). The MCOE assessment found that Student had deficits with her concentration and memory, plus social skills and adaptive behaviors deficits. Washington also conducted a speech and language assessment, which found Student eligible for speech and language services due to her expressive and receptive language deficits.

4.      In February 2002, Parents had Rochelle B. Wolk, Ph.D., perform a neuropsychological evaluation. Dr. Wolk observed that Student was a hard worker and wanted to succeed. Dr. Wolk reviewed the MCOE assessment and criticized it for underestimating Student's cognitive functioning. Dr. Wolk found that Student had a full scale IQ of 84, 14th percentile on the WISC-III, and performance IQ of 91, 27th percentile, and verbal IQ of 80, 9th percentile. Dr. Wolk's administration of the WISC-III subtests established Student's strengths in learning visually, and weakness in learning when language was involved. Dr. Wolk found that Student had significant deficits regarding her attention, inability to filter out sounds, and problems with impulsivity. Dr. Wolk noted that Student had some difficulty performing activities of daily living, grooming, dressing, chores and personal safety, due to her inability to maintain focus and process multiple pieces of information. Dr. Wolk found that Student had difficulty with her written expression and ability to organize and extract information from material that she read or heard. Finally, Dr. Wolk observed that Student had difficulty reading social cues.

5.      Dr. Wolk made a series of recommendations for Student's continued education. Of importance was Dr. Wolk's recommendation that educators work with Student on developing her internal language to help her solve problems and process and organize information. Dr. Wolk recommended that Student have preferential seating, multiple modes of instruction, and cueing to ensure that she stay on-task and to make sure that she understands the instruction. Dr. Wolk also recommended that Student receive intensive help with her written expression, including the ability to answer, who, what, when, where, why

---

[2] Washington serves students from kindergarten through eighth grade.

and how questions ('wh'), and her ability to extract and organize information from her reading, plus assistance with note taking. Dr. Wolk did not make any recommendations that Student's education focus on learning daily living skills.

6.     MCOE conducted another psychoeducational assessment for Washington in October 2003. MCOE administered the WISC-IV as the WISC was revised after Dr. Wolk's evaluation. Student obtained a full scale IQ of 74, 4th percentile. Her verbal comprehension IQ was 83, 13th percentile, perceptual reasoning IQ of 84, 14th percentile, processing speed IQ of 78, 7th percentile, and working memory IQ of 71, 3rd percentile. The District's expert, Robert Patterson, Ph.D., explained that the WISC was renormed in 2003 because IQ scores had increased over the period of years so that an IQ of 100 was no longer the median score. Therefore, the renormed scores on the WISC-IV were lower than the WISC-III. On the Wechsler Individual Achievement Test, Second Edition (WIAT-II), Student's scores indicated significant deficits with reading comprehension, math reasoning, written expression, and verbal, story, and sentence memory. Student's strengths were in reading decoding, picture and finger memory, word reading and numerical operations. MCOE found that Student had significant deficits with verbal memory, processing speed, and with her attention. The assessment concluded that Student had low average abilities and was performing as expected with her deficits.

7.     Washington also conducted a speech and language assessment in November 2003. The assessment found that Student had significant deficits in auditory processing, which would negatively impact her ability to follow verbal directions, remembering what she heard and then comprehending verbal information. The assessment found that Student had deficits with her receptive and expressive language, but that her skills had improved since the prior assessment. The report noted that a 2002 University of California, San Francisco assessment found that Student had difficulty understanding social cues and participating in unstructured, age appropriate social activities.

8.     Washington held an IEP meeting in December 2003. Parents did not consent to the proposed IEP because they did not want Student attending SHS for SY 2004-2005. Washington held another IEP meeting on June 2, 2004, and proposed that Student attend full-time at a Washington middle school for SY 2004-2005. Mother consented to the IEP, but Student did not start attending until March 2005. At middle school, Student received assistance in mainstreaming in her regular education history class. Student had trouble maintaining focus and following along with material read in class. Student did not mingle with other students when she arrived at lunch.

9.     Washington held an IEP meeting on May 24, 2005, for Student's transition to SHS. Karen Pfeiffer, District RSP specialist for SHS, attended the IEP, along with District speech and language specialist Jean Bye and a general education teacher. Mother was accompanied by Mary Rose,[3] Student's private speech and language therapist and tutor, who

---

[3] Also known as Mary Krieg.

6

had worked with Student since fourth grade. Ms. Pfeiffer spoke to Mother and the Washington representative before the IEP meeting to obtain information about Student. Ms. Pfeiffer participated in the creation of Student's goals and placement based on information presented in the IEP meeting. Mother also visited SHS before the IEP meeting.

10.    The May 24, 2005 IEP offered Student two periods of special day class (SDC) instruction in math and independent studies, along with direct speech and language services for two times a week, thirty minutes per session. For the remainder of Student's day at SHS she would be in general education classes. The IEP proposed study skills, consumer math and reading goals. The District agreed to convene an IEP meeting within the first month of Student's attendance at SHS to review her goals. The study skills goal was to work on Student's deficits regarding her organization and attention. The consumer math goal focused on Student learning basic math functions related to personal finance and shopping. The reading goal worked on Student's ability to identify the main idea in her regular education reading and to find information in the texts that supported the main idea.

11.    Regarding Student's speech and language needs, Parents had a private assessment conducted shortly before the IEP meeting. However, Mother did not present the assessment results at the IEP meeting, nor inform the other IEP team members of the assessment. Therefore, Ms. Bye wrote in the May 24, 2005 IEP meeting that no speech and language information was available, and that the District would conduct a full assessment in the first month of SY 2005-2006 because the last assessment was a year and a half old. The IEP offered accommodations and modifications of access to class notes and test-taking in the resource room. The IEP did not state whether the District would provide Student with an instructional aide in her regular education classes. The IEP also included an ITP to assist Student's transition to larger school. Mother consented to the IEP.

*IEP In Effect As Of July 2005*

12.    As of October 9, 2006, a request for a due process hearing in California must be filed within two years from the date the party initiating the request knew or had reason to know of the facts underlying the basis for the request.[4] The two-year statute of limitations in this case began running on July 6, 2005.

13.    Mother testified that the District sent her a transition plan during the summer of 2005 with goals that were not included in the May 2005 IEP. However, the District did not modify the May 24, 2005 IEP nor present Parents with a transition plan. In July 2005, the District merely sent Parents another copy of the May 24, 2005 IEP. Student did not present any evidence that the District misrepresented the effective date of the May 2005 IEP or revised the IEP in its July 2005 correspondence. Therefore, the Student's challenge that

---

[4] The two-year statute of limitations does not apply if a parent was prevented from requesting a due process hearing by specific misrepresentations by the local educational agency that it had solved the problem forming the basis of the due process hearing request.

7

the District did not develop an appropriate IEP relates to the May 24, 2005 IEP, which is
outside the two-year statute of limitations.

*Adequacy of the District's October 25, 2005 IEP*

14.    Student contended that the District failed to consider information Mother
presented before and at the October 25, 2005 IEP meeting, along with Student's prior
assessments. Student asserted that, based on information Mother presented, and in the prior
assessments, the District should have changed Student's educational program to place her
entirely in special education classes with a one-to-one aide for the entire school day due to
her cognitive, attention, social skills and language deficits.

15.    A district must provide a student with an educational program that is
reasonably calculated to provide the student with some educational benefit in the least
restrictive environment. A district is not required to provide a special education student with
the best education available or to provide instruction or services that maximize a student's
abilities. A school district need only provide a basic floor of opportunity that consists of
access to specialized instructional and related services, which are individually designed to
provide an educational benefit to the student.

16.    The IDEIA provides that an IEP must contain a statement of current levels of
educational performance, measurable annual goals, and a means to measure progress towards
the goals. Additionally, the IEP team must take into account the information provided by
IEP team members, which include the parents, results of the student's most recent
assessments in formulating the IEP to determine the student's present levels of performance
and the student's unique needs, and to set appropriate goals.

17.    A school district must comply both procedurally and substantively with the
IDEIA. While not every procedural flaw constitutes a denial of FAPE, one that impedes a
student's right to receive a FAPE, significantly impedes a parent's opportunity to participate
in the IEP process, or causes a deprivation of educational benefit to a student, constitutes a
denial of FAPE.

18.    The District did not hold an IEP meeting within the first month of Student's
attendance at SHS. Initially, Charles Haynes, Student's case carrier and consumer math
teacher, did not know of the May 24, 2005 IEP's provision to hold an IEP meeting within the
first month of Student's attendance at SHS. Mr. Haynes learned of this provision when he
received Mother's September 16, 2005 letter requesting an IEP meeting to discuss Student's
goals, including adding speech and language goals. Mother also requested that the District
provide accommodations of extra time for tests, assignment modifications and a classroom
aide. Mr. Haynes responded on September 20, 2005, informing Mother that his review of the
goals indicated that they were appropriate for Student. Mr. Haynes did not know whether
Student required a speech and language assessment to develop speech and language goals.

19.    On September 23, 2005, Mr. Haynes presented Father with a proposed
triennial assessment plan, which included academic, social-emotional, cognitive, visual
motor, speech and language, and health assessments. Mr. Haynes prepared a triennial
assessment plan, and not just a speech and language assessment plan, because the District did
not have any prior assessment information in Student's education records from Washington.
Mr. Haynes also mistakenly believed Student's triennial assessment was due in the April
2006, when the actual date was November 2006. Father signed the assessment plan.
However, Parents rescinded their consent on September 28, 2005, and reiterated their request
for an IEP meeting.

20.    The District held an IEP meeting on October 25, 2005. The District still did
not have Student's prior assessments from Washington. Mother attended with Ms. Rose, and
Rita Rispoli, an educational consultant who had provided Student with educational services
since kindergarten. Mother relayed her concerns regarding Student's low cognitive
functioning based on Dr. Wolk's 2002 assessment, Student's social skills deficits, need for a
classroom instructional aide, and concerns regarding Student's safety. Parents' concerns
regarding Student's safety involved an incident when the District could not locate Student on
campus and another incident when she was found alone in a classroom with another student.

21.    Mr. Haynes, Julie Gannon, the business technology teacher, and Ms. Pfeiffer,
the independent studies teacher, attended the October 2005 IEP meeting. During the first
month and a half Student attended SHS, District staff had observed that Student
demonstrated significant problems with paying attention to classroom instruction.
Mr. Haynes reported that Student had difficulty with multiple step math and word problems.
Student was also failing her business technology class. Student experienced difficulty
transitioning from a smaller educational setting to a campus with approximately 2000
students; she was extremely shy and did not mingle with the other students, either in general
education or special education.

22.    The District considered the information Mother presented about Student's
cognitive abilities and attention deficits, along with information from District staff's own
observations. The evidence was not clear if the District provided Student with a classroom
instructional aide before the October 25, 2005 IEP meeting. However, the District promised
to provide Student with an instructional aide in her regular education classes, except physical
education, to keep Student on-task and to take class notes. The District provided Student
with additional academic support in her individualized studies class, plus worked with
Student on her organizational deficits. The District needed to provide with an instructional
aide due to her attention deficits, poor working memory, and auditory processing deficits that
prevented her from accessing the class instruction. The District also agreed to have a person
go through Student's business technology binder and assist Student in organizing her class
material, and to have her take ownership for organizing her class material. Additionally,
Mr. Haynes agreed to develop additional academic goals based on the discussions that all the
IEP team members had. Mother did not sign IEP to indicate whether she consented to the
IEP because she wanted to wait until Dr. Wolk completed her assessment. However, Mother

did not inform the District of her decision at the IEP meeting, and afterwards when the District attempted to schedule a follow-up meeting.

23.     Regarding Mother's concern about Student's safety following two on-campus incidents, the District did not need to amend the May 25, 2005 IEP to meet Student's needs because Student was not at risk; while District could not locate Student for over an hour on September 28, 2005, she was never missing or in danger. Speech and language therapist Gisele Curnow was with Student the entire time, but had inadvertently failed to "check out" Student from class.[5] The District acted appropriately in contacting Parents while school staff looked around the campus for Student. Additionally, there is no credible evidence suggesting Student was at any risk of harm when she was alone with another student, who was 17 years old, in a classroom during lunch, and nothing happened between the students.

24.     Regarding Student's social deficits, the District agreed with Mother that Student had problems with her pragmatic language skills because Student had difficulty reading social cues and body language. Additionally, Student made socially inappropriate comments to her classmates. Therefore, the District agreed to develop social skills goals. However, the District could not create pragmatic language goals until it conducted a speech and language assessment because the last comprehensive assessment was over two years old. Mother refused to consent to any District assessment until Dr. Wolk completed a new neuropsychological assessment, and refused to sign the IEP to indicate whether she agreed to the District's proposals, such as developing new IEP goals.

25.     On November 2, 2005, Mr. Hayes sent Parents new proposed goals in the areas of written expression, classroom behavior, and social interaction, along with the prior consumer math and study skills goals from the May 24, 2005 IEP. The District also proposed a contract with Student to assist her in completing missed business technology classwork and to complete future assignment. Before sending out the letter, the District proposed to hold an IEP meeting on November 7, 2005, to discuss the proposed goals and to finalize the October 25, 2005 IEP.

26.     The proposed written expression goal addressed writing a composition, and focusing on familiar experiences or events, because Student needed to focus on concrete examples due to her inability to make inferences. The goal addressed organization, sentence and paragraph structure, capitalization and punctuation rules and answering 'wh' questions. The classroom behavior goal addressed following instructions and not interrupting the teacher, remaining on-task, and asking for assistance and moving onto another appropriate task after completing a task. For social interaction, the District proposed working with Student on displaying appropriate behavior in a variety of school situations, such as lunchtime and in the classroom.

---

[5] Ms. Curnow was not informed that Parents had rescinded their consent to the District's assessment when she started her assessment.

27.     Mr. Haynes drafted the written expression, classroom behavior, and social interaction goals based on information provided by Mother and Student's performance at SHS.  While Mr. Haynes did not have Dr. Wolk's 2002 assessment, the written expression goal addressed the writing skills deficits raised by Dr. Wolk, and tracked her recommendations, such as focusing on concrete information, answering 'wh' questions and organizational skills.  The classroom behavior goal addressed issues raised by Dr. Wolk and Mother regarding keeping Student on-task and addressing her social deficits.  Finally, the District's proposed social interaction goal responded to Dr. Wolk's and Mother's concerns about Student's lack of social skills in dealing with other students.

28.     Mother cancelled the November 7, 2005 IEP meeting on November 4, 2005, which was the first day of Dr. Wolk's assessment of Student.  Mother did not inform the District at the October 25, 2005 IEP meeting of the dates of Dr. Wolk's assessment. Dr. Wolk completed her assessment on December 5, 2005, and on the same day Mother consented to the District's speech and language and academic assessments.  Ms. Curnow conducted her speech and language assessment and the District held the next IEP meeting on January 31, 2006.  Therefore, Mother prevented the District from finalizing modifications to Student's goals by refusing to attend an IEP meeting and not informing the District whether she consented to the proposed goals

29.     The evidence did not establish that the District failed to consider information from prior assessments and Mother in the October 25, 2005 IEP meeting.  The District did not have the prior assessments because Washington did not provide the District with a copy. As determined in Factual Findings 22 through 24 and 27, the District considered the information presented by Mother before and during the IEP meeting.  The District agreed to provide Student with an instructional aide in her general education classes.  As determined in Factual Finding 23, Mother's concerns about Student's safety were overstated as Student was never missing on September 28, 2005, because she was with Ms. Curnow.  Additionally, Student being alone in the classroom with a 17-year-old boy did not establish that Student needed additional safety goals.  Pursuant to Factual Findings 22 through 24, there was insufficient evidence to establish that the District needed to modify the three goals from the May 24, 2005 IEP, to which Mother had consented, based on Student's performance at SHS. Additionally, pursuant to Factual Finding 25 through 27, the District's proposed written expression, classroom behavior, and social interaction goals were based on all available information at the time.  Finally, as determined in Factual Findings 22 through 27, the District's proposed goals adequately addressed Student's cognitive, attention, academic and social skills deficits, and were reasonably designed to allow Student to receive some educational benefit.

*January 31, 2006 IEP*

   *Dr. Wolk's Assessment*

30.     Dr. Wolk reassessed Student on November 7, 14 and 23, 2005.  Dr. Wolk interviewed Student alone and in the presence of Mother.  Dr. Wolk also interviewed Mother

11

separately. Dr. Wolk also obtained four questionnaires from Student's teachers. Mother provided Dr. Wolk with copies of Student's school records, recent school testing, samples of school work, and correspondence between Mother and school personnel. In speaking with Student, Dr. Wolk observed that Student's vocabulary and syntax were immature for age, but her speech content was age-appropriate. During the testing, Dr. Wolk documented problems with Student's attention span, even in a distraction reduced testing environment. Dr. Wolk also found that Student worked slowly compared to her peers, even though Student was motivated and put in maximum effort in the testing. Dr. Wolk noted that Student was taking medication for seizures and attention deficit disorder.

31.    Dr. Wolk administered the WISC-IV, and Student obtained a full scale IQ of 73, which placed her in the 4th percentile. Student scored a verbal comprehension IQ of 83, 13th percentile, perceptual reasoning IQ of 75, 5th percentile, working memory IQ of 80, 9th percentile, and processing speed IQ of 73, 4th percentile. Student's WISC-IV scores were consistent with the results obtained in the 2003 MCOE assessment. Dr. Wolk stated that Student's scores placed her in the borderline to low average range for cognitive functioning, she confirmed with Student's 74 composite score on the Kaufman Adolescent and Adult Intelligence Test (Kaufman). However, Dr. Wolk failed to document whether Student's scores were an accurate measure of Student's cognitive ability, or more a reflection of her attention deficits that prevented a more accurate representation of her ability.

32.    As with the 2002 assessment, Dr. Wolk observed that Student continued to have significant language delays with her receptive language regarding her ability to follow verbal directions and inability to maintain focus and extract information. Student's test results of the 13th percentile on the WIAT-II listening comprehension subtest, and 16th percentile in an equivalent subtest in the Kaufman, demonstrated her inability to extract complex information. Additionally according to Dr. Wolk, Student's low cognitive ability compounded her inability to extract information.

33.    Dr. Wolk did not believe that Student could attend in a general education classroom due to auditory and visual distractions, and therefore would not understand the classroom instruction with her attention deficits. However, Dr. Wolk's opinion was conjecture as she never observed Student at school nor included in her report any comments from Student's teachers regarding her ability to attend in class and classroom performance.

34.    Dr. Wolk found that Student had significant deficits regarding her working memory, which required Student to receive information multiple times before she would understand it. Student required the information to be provided in similar pieces and Student needed to be taught how to independently break down complex information into more manageable chunks. Additionally, Student's attention deficits hindered her ability to recall information as her distractibility prevented her from obtaining as much information as possible.

35.    Student had deficits with her expressive language because she lacked a mature vocabulary with her use of simple syntax and focus on concrete imagery that was more

12

representative of a 12-year-old child. Student also had difficulty expressing emotion in her speech as her cadence and tone was flat. Student had pragmatic language deficits as she had difficulty picking up nuances in the speech of others and missed any additional meaning the speaker wanted to convey.

36.    Dr. Wolk also found that Student had significant deficits regarding her executive functioning, which involved Student's ability to perform more mature thinking and problem solving, such as awareness that a problem exists, evaluating multiple solutions to a problem and to generalize from prior experiences. Dr. Wolk opined that Student could not perform activities of daily living due to her executive functioning deficits, plus her cognitive deficits, poor working memory and inability to extract information from oral and written materials. Additionally, Student's deficits with her executive function negatively impacted her ability to properly handle social situations, and her poor judgment and impulsivity made her an easy target for exploitation. However, Dr. Wolk did not give the factual basis of her opinion; she did not cite to any testing or information from Mother, Student or teachers to back up her opinion. Dr. Patterson explained that Dr. Wolk needed to administer the Vineland Adaptive Behavior Scales to measure Student's ability to perform everyday tasks. Therefore, Dr. Wolk's opinion that Student could not properly perform activities of daily was simply conjecture as Dr. Wolk did not base her opinion on adaptive behavior testing, nor provide real life examples of Student's inability to perform these tasks.

37.    Regarding Student's academic deficits, Dr. Wolk found that Student had significant reading comprehension deficits despite her ability to decode what she had read. Student also had deficits with her written expression, which Dr. Wolk believed were so significant that she did not expect Student to ever write an age-appropriate composition. Dr. Wolk believed that Student's reading and writing skills were so severe due to her cognitive deficits that Student would not be able to pass the California High School Exit Exam (CAHSEE). Dr. Wolk did not believe that Student could perform mathematic functions beyond basic consumer math. However, Dr. Wolk never referred to Student's performance in her classes to support her contention regarding Student's reading, writing and math skills, and whether Student's May 24, 2005 IEP and subsequent proposed changes met Student's unique needs. More troubling, Dr. Wolk demonstrated limited knowledge regarding high school curriculum and regular education class requirements. For these reasons, Dr. Wolk's recommendations regarding academic abilities were not persuasive.

38.    Dr. Wolk made lengthy recommendations for Student's education, which called for Student to be educated in a small class environment due to her academic and attention deficits. Dr. Wolk also recommended that due to Student's low cognitive functioning ability that her education focus on teaching basic skills focused on activities of daily living and vocational skills. Dr. Wolk did not believe that Student could read grade-level material, and therefore stated that Student needed simplified texts. However, as noted in Factual Findings 31 and 36, Student did not have the level of cognitive impairment Dr. Wolk opined, nor did Dr. Wolk explain she did find that Student required this level of assistance in her 2002 assessment. Dr. Wolk appropriately recommended that Student's instruction be tied to examples from her life experiences and presented in multiple methods

13

to increase her retention. Further, the instruction needed to break down information to allow Student to more easily retain the information due to her working memory deficits, and to teach her to take notes and organize information. Dr. Wolk recommended that Student needed assistance in developing inner language so she could ask herself questions to problem-solve and extract information from oral and written sources. Dr. Wolk also recommended teaching Student techniques to extract and organize information she read. Student needed to learn how to ask 'wh' questions so she could independently evaluate if she learned the elements of what she read. Regarding Student's writing, she needed to learn organizational skills. Dr. Wolk recommended that Student participate in a social skills group due to her social skills and pragmatic language deficits.

### District's Speech and Language Assessment

39.     Ms. Curnow conducted the District's speech and language assessment in January 2006. Ms. Curnow reviewed Student's prior Washington and private speech and language assessments, along with Dr. Wolk's 2002 and MCOE's 2003 assessments. Ms. Curnow briefly observed Student in her business technology and independent studies classes. Before conducting the assessment, Ms. Curnow had worked with Student during speech and language sessions; Ms. Curnow used those sessions to obtain information about Student to assist in drafting speech and language goals. Ms. Curnow conducted the assessment in a one-to-one, distraction-reduced environment, and repeated instructions for Student and cued her to attend. Ms. Curnow testified that Student's attention and working memory deficits lowered her scores, because Student had problems remembering the instructions or testing materials. Ms. Curnow was a knowledgeable and credible witness who conducted a thorough assessment. Student did not challenge the accuracy of Ms. Curnow's assessment, and the evidence established that the assessment accurately reflected Student's deficits and present levels of performance, as noted below.

40.     Student had expressive and receptive language deficits, which were consistent with prior assessments. Similar to Dr. Wolk's findings, Ms. Curnow found that while Student could decode, knowing the words spoken to her, Student had significant problems understanding the meaning of spoken paragraphs, recalling sentences and semantic relationships, which is ability to connect concepts. Student's scores on the Clinical Evaluation of Language Fundamentals, Fourth Edition (CELF-4) demonstrated that she had significant receptive language deficits due to her poor working memory and inability to internally organize verbal information. Student's poor working memory and inability to internally organize her thoughts negatively impacted her expressive language as she could not recall sentences, formulate sentences, and use age-appropriate language.

41.     While Student's attention deficits may have depressed her CELF-4 scores, she still scored significantly below average on the CELF-4 subtests and composite scores that measured her expressive and receptive language abilities. Student required preferential seating and classroom assistance in following directions and note taking due to her expressive and receptive language deficits. She also required help in internally organizing classroom material to understand the intent, meaning and structure, and then the ability to

14

organize her thoughts to coherently explain her thoughts orally and in writing. She especially required assistance in understanding new materials and applying critical thinking to the new information.

42.     Ms. Curnow also administered the Comprehensive Assessment of Spoken Language (CASL) to measure Student's oral language skills. Student scored below average to significantly below average on seven of the nine CASL subtests, which were consistent with Student's scores on the CELF-4. On the Receptive One-Word Language Vocabulary Test, which has a student view four pictures, hear a target word and then select the correct picture, Student's standard score was 88, which placed her in the 21st percentile. Student had a better ability to name items after a viewing a picture as she had a standard score of 93, 32nd percentile, on the Expressive One-Word Language Vocabulary Test. The differences in the scores reflected Student's receptive language deficits.

43.     Ms. Curnow also engaged Student in a short conversation to examine her pragmatic language abilities. While Student's speech articulation, voice and fluency were age appropriate, Student demonstrated problems in initiating conversation and maintaining eye contact. Ms. Curnow also asked Student to retell in writing two stories that Ms. Curnow read to her and that she then read to herself. Student had problems organizing her thoughts and presenting them in a clear manner. Additionally, Student's story left out important facts, contained spelling, punctuation and grammatical errors, and did not have an ending.

44.     Ms. Curnow observed during her therapy sessions Student's repeated inability to follow directions, impulsivity, distractibility, rushing to complete tasks without regard to the quality of her work, and problems maintaining attention. Additionally, Student would appear to be working on an activity or reading when in fact she would be thinking of something else. However, Ms. Curnow could easily redirect Student back on-task.

*Speech and Language Information from Ms. Rose*

45.     At the January 31, 2006, Ms. Rose presented the IEP team with her notes regarding Student's speech and language needs and deficits. Ms. Rose based her report on prior reports, information provided by Parents and her observations of Student. Ms. Rose's information comported with Ms. Curnow's assessment regarding Student's attention deficits and the negative impact on Student's learning in class. Ms. Rose reported the same deficits in expressive, receptive and pragmatic language and receptive and expressive vocabulary noted by Ms. Curnow. Ms. Rose's report differs from Ms. Curnow's assessment regarding Student's speech as Ms. Rose stated that Student's speech was flat and lacked any emotional meaning. Ms. Rose made recommendations in her report. However, her recommendations merely parroted those in Dr. Wolk's report, and did not provide any additional guidance.

*Adequacy of January 31, 2006 IEP*

46.     Mother attended the IEP meeting with Ms. Rose and Robin Brennan, Parents' then-attorney. Dr. Wolk did not attend the IEP meeting, but the District had reviewed her

15

report before the meeting. Ms. Curnow presented her assessment report and three proposed speech and language goals. The District initially proposed Student continuing with her same class schedule, two thirty minute speech and language sessions a week, and continuation of the study skills, consumer math and reading goals from the May 24, 2005 IEP. While not documented in the IEP, the District continued to provide Student with an instructional aide.[6] Student asserts that the District did not consider information from Dr. Wolk's 2005 assessment and information presented by Mother and Ms. Rose in developing the IEP, and that the IEP failed to address Student's low cognitive skills, attention problems, social deficits, pragmatic language deficits and safety issues.

47.    The District considered the information from Dr. Wolk's recent assessment and information provided by Mother and Ms. Rose concerning Student's deficits and needs. The fact that the District did not agree with all the recommendations and requests by Mother, Dr. Wolk and Ms. Rose does not mean that the District ignored their information. The District agreed with Mother that Student needed a social skills group and agreed to investigate whether any existing social skills group would meet Student's needs.[7] Regarding the three existing goals from the May 24, 2005 IEP, Mother, Ms. Brennan and Ms. Rose did not propose any changes to those goals, nor raise any criticism that the goals did not comport with the recommendations made by Dr. Wolk.[8] The District agreed with Mother's request to transfer Student out of her business technology class and placed Student in a culinary arts class for the second semester. The District also added 50 minutes per month for Ms. Curnow to consult with Student's teachers regarding her speech and language needs. Additionally, Mother, Ms. Brennan or Ms. Rose did not raise any objection to the proposed speech and language goals. While Mother still had concerns after the October 25, 2005 IEP meeting regarding Student's safety as SHS, Mother's fear about Student being alone with a 17-year-old boy was unwarranted and an overreaction as Student learned from this incident and never repeated this conduct. Therefore, the evidence established that the District considered Dr. Wolk's assessment and information provided by Mother and Ms. Rose.

48.    Student alleges that the January 2006 IEP failed to address her low cognitive skills. However, the IEP contained several components to address those needs. The IEP continued to offer an instructional aide. Ms. Pfeiffer provided academic support in her individual studies class. Student made adequate educational progress in the first semester, despite the fact that her attendance at SHS was her first experience in large classes. Student received 'C' grades in her English and consumer math classes. Student improved her business technology grade from failing at the October 25, 2005 IEP meeting to a 'D' grade. Student received 'B' grades in her physical education, vocal music and individual studies

---

[6] Student did not allege in her Complaint that the District committed a procedural violation by failing to document in Student's IEP the instructional aide support.

[7] Ms. Jones-Powers wrote Parents on February 17, 2006, to inform that the District had located language-based social skills group of three to four girls, and proposed that one of Student's weekly speech and language sessions consist of this social skills group and the other session individual therapy. Mother did not reply until April 3, 2006, when she agreed to observe a social skills group.

[8] Dr. Wolk did not testify about the adequacy of the IEP.

16

classes. The evidence did not establish that Student required a less academically demanding schedule that focused primarily on Student learning activities of daily living; instead, she succeeded in her classes with the District provided accommodations and modifications. The District provided assistance in this area through the consumer math and business technology classes, which taught Student functional skills. Student did not exhibit any demonstrated need for additional specialized instruction regarding activities of daily living; she came to school well dressed and was able to maintain herself during the school day. Mother's testimony regarding her daughter's inability to perform simple tasks, such as being able to buy coffee at a coffee shop, was an overstatement as Mother constantly underestimated her daughter's ability. Mother, Ms. Rose or Ms. Rispoli did not provide any real-life examples of Student's deficiencies. In contrast, Ms. Curnow, Mr. Haynes and Ms. Pfeiffer credibly reported numerous examples of Student's ability to take care of herself and to learn from her mistakes. For these reasons, the District's IEP address Student's cognitive deficits and reasonably calculated to allow her to make adequate educational progress.

49.     Regarding Student's attention deficits, the District adequately addressed these deficits by providing Student with an instructional aide during her general education classes, plus the accommodations and modifications in the January 2006 IEP. The evidence did not establish that the instructional aide failed to keep Student on-task or redirect her during class. Additionally, Student did not demonstrate that the District's accommodations and modifications, such as preferential seating, additional time for tests and homework and modified curriculum did not address Student's attention deficits. Also, the evidence did not establish that her attention deficits were so severe that she could not be easily redirected.

50.     Additionally, the District's study skills goal addressed Student's attention and organizational deficits by assisting Student in keeping track of her assignments and bringing required materials to class. Additionally, one of the new speech and language goals focused on Student's ability to attend, organizational strategies and creating a checklist as reminder to check for frequent writing errors. In light of these findings, the IEP goals adequately addressed Student's attention deficit, and constituted goals that were reasonable calculated to provide Student with some educational benefit.

51.     To address Student's social skills deficits, the District offered to place Student in a social skills group. At the time of the IEP meeting, Student was making friends at school, which evidenced an improvement with her social skills. Mother's testimony that Student could not make friends due to her social skills deficits was not credible because Mother did not provide actual examples, while Ms. Pfeiffer and Mr. Haynes, who had daily contact with Student, gave persuasive testimony to the contrary. While Student continued to have problems with making socially inappropriate comments in class and problems interacting with her classmates due to her deficits in understanding nonverbal cues, Ms. Curnow worked with Student on these issues during her speech and language sessions and Student learned from her mistakes. Therefore, the January 2006 IEP adequately addressed Student's social skills deficits.

52.     Regarding Student's pragmatic language deficits, Ms. Curnow's assessment accurately identified Student's deficits. The District offered speech and language services and consultation with Student's teachers to address Student's pragmatic language deficit. Additionally, to address Student's pragmatic language deficits, the District offered to locate social skills groups for Student. Testimony from Ms. Curnow established that these services would have addressed Student's unique needs in speech and language.[9] Therefore, the evidence did not establish that the January 2006 IEP failed to adequately address Student's pragmatic language deficits.

53.     Student alleges that the January 2006 IEP failed to address her needs related to safety. Before and during the IEP meeting, Mother continued to raise concerns about Student's safety. Before the IEP meeting, Mother requested that Student be escorted to class, especially her business technology class after lunch, because Student was missing class. Mother unilaterally decided to come to SHS to escort Student to her business technology class, which the District permitted, even though Student did not require an escort. In November 2005, the District proposed a contract for Student to attend her business technology class; the contract offered more assistance, because Student's frustration with the class, not safety, was the reason she did not attend class. However, Mother did not agree to the contract. The District addressed Mother's safety concerns by discussing with Student that she should not be alone in a classroom with a boy. Finally, Dr. Wolk's report did not establish that Student had any significant safety deficits, given that Dr. Wolk never observed Student in any real-life situations nor heard any reports of any real-life safety concerns regarding Student. Thus, Student did not establish that she required additional supports or goals in the January 2006 IEP.

54.     As determined in Factual Findings 46, 47, 48 and 53, in creating the January 31, 2006 IEP, the District considered the information presented by Mother, Ms. Rose and Dr. Wolk's assessment, and made changes to the IEP based on this information. The fact that the District did not agree with all the information presented does not mean that the District ignored that information. Pursuant to Factual Findings 48 through 53, Student did not establish she needed the additions and changes to the IEP that Mother, Ms. Rose, and Dr. Wolk requested. Thus, Student did not establish that the District's IEP failed to address her deficits as the District's IEP was reasonably calculated to provide Student with some educational benefit.

*Adequacy of District's April 19, 2006 IEP*

*District's Psychoeducational Assessment*

55.     At the January 31, 2006 IEP meeting, Mother signed an assessment plan that allowed the District to conduct a psychoeducational assessment. Reba Morga, District

---

[9] In addition, Mother, Ms. Rose and Ms. Brennan did not raise any objection in the IEP meeting that the District's IEP failed to address Student's pragmatic language deficits or that Ms. Curnow's assessment did not accurately describe the severity of Student's deficits.

school psychologist, conducted the assessment on March 29, 2006. As part of the assessment, Ms. Morga reviewed Student's prior assessments from Dr. Wolk and MCOE, and Student's grades. Ms. Morga obtained Student's health and developmental history from prior evaluations and interviewing Mother. Mother informed Ms. Morga that Student had not experienced a seizure in four years, was being weaned off her seizure medication, and took medication for attention deficit disorder. Ms. Morga assessed Student in a one-to-one, distraction-reduced setting, and Student cooperated and put forward her best effort during the assessment.

56.    Ms. Morga administered the Woodcock-Johnson Tests of Achievement, Third Edition (WJTA-III), Woodcock-Johnson Tests of Cognitive Abilities, Third Edition (WJTCA-III) and Wide Range Assessment of Memory and Learning, Second Edition (WRAML-2) to assess Student's cognitive abilities and to identify any deficits that impacted her cognitive abilities. Ms. Morga did not administer any tests to Student that Dr. Wolk administered in November 2005.

57.    On the WJTCA-III, Student displayed significant deficits on the visual-auditory learning subtest, which involves both auditory and visual memory like note taking. Student had a standard score of 71, which placed her in the third percentile. Additionally, Student's scaled score of 78, in the 7th percentile on the concept formation subtest, which involves symbolic reasoning, indicated a significant deficit in that area. These scores were consistent with previous information about Student's weaknesses in these areas, as shown by the need for her instruction to focus on concrete examples due to her inability to reason with abstract information, and difficulties in note taking.

58.    Despite Student's deficient scores on the visual-auditory learning and concept formation subtests, her cognitive ability on the WJTCA-III fell within the low average range due to her higher scores on the other subtests. On the sound blending and incomplete word subtests, Student's scores were above average. Student's composite scores for verbal ability was 84, 14th percentile, thinking ability was 85, 16th percentile, and cognitive efficiency was 88, 20th percentile. Ms. Morga's results on the WJCTA-III indicated that Student had greater cognitive ability than Dr. Wolk determined in her assessment. Ms. Morga's results were more persuasive than Dr. Wolk's as Ms. Morga's results comported with Student's actual academic performance at SHS.

59.    Student's results on the WRAML-2 are consistent with prior findings that Student has significant deficits with her verbal memory, such as her standard score of 77 on the verbal memory index subtest, which placed her in the 6th percentile. Student's verbal memory index score was consistent with her expressive and receptive language deficits and ability to process auditory information. Student's visual memory was much stronger, as reflected by her standard score of 91, 27th percentile. On the attention/concentration index, Student had a standard score of 80, 21st percentile. Student's overall memory index standard score of 80, 9th percentile, on the WRAML-2 placed Student in the low average range and was consistent with her low average cognitive abilities.

19

60.    Student's WJTA-II scores were consistent with her low average cognitive abilities and deficits regarding her receptive language. Student had deficient scores with reading fluency, understanding directions, and applied math problems, which all required Student to process information. Student had low average scores with her writing sample and passage comprehension.

61.    Ms. Morga gave the Behavior Assessment Scale for Children (BASC) questionnaire to Student's teachers and Mother. On both the teachers' and Mother's questionnaires, Student was in the clinically significant range in the areas of hyperactivity, attention problems, atypicality, leadership and functional communication. The teacher form has a rating for study skills that rated Student at risk due to poor skills. Mother rated Student significant lower than her teachers on conduct problems, internalizing problems, anxiety, depression, withdrawal, adaptability, and social skills. Mother's much lower scores reflected Mother's underestimation of Student's abilities and overestimation of problems that Student had. Mother failed to provide concrete examples of Student's problems and lack of abilities.

62.    Ms. Morga's findings regarding Student's attention and organizational deficits were consistent with Dr. Wolk's findings. However, Ms. Morga did not agree with Student's position that she could only receive a FAPE in a small special education class environment due to her cognitive deficits and attention deficits. Ms. Morga recommended that Student could make adequate education progress in a general education classroom with proper accommodations and modifications, such as an instructional aide, preferential seating, or added time for assignments and tests, to keep her on-task in the classroom.

63.    The evidence established that Ms. Morga's psychoeducational assessment was an accurate representation of Student at the time of April 19, 2006 IEP meeting. Ms. Morga's findings regarding Student's cognitive ability were consistent with Dr. Wolk's, although Dr. Wolk emphasized that Student was on the borderline range of being mentally retarded. The tests that both Dr. Wolk and Ms. Morga administered have confidence ranges that are above and below Student's scores, given that Student's score might fluctuate due to environmental and external factors on any given test day. Dr. Wolk did not provide confidence ranges in her report. Rather, Dr. Wolk just focused on full scale IQ of 73 as proof of Student's cognitive ability, and did not consider Student's higher test scores in her assessment and that Student's attention deficits could have depressed her full scale IQ score. The lower scores in the confidence range in Ms. Morga's assessment place Student in the low average cognitive range, which would correspond to the high end of the confidence range in Dr. Wolk's assessment. Therefore, Student's true cognitive ability is more likely somewhere in the low average range, and not the lower borderline functional ability that Dr. Wolk found.

*April 19, 2006 IEP*

64.    Besides challenging the adequacy of the District's proposed goals, accommodations and modifications and services, Student also contended that the District's proposed placement in the same mix of general and special education classes did not meet

her unique needs because she needed a smaller class environment. Furthermore, Student contended that the District's proposed goals were not measurable and sufficiently specific, and not based on Student's present levels of performance. The District argued that Student's request for a small special day class setting was not the least restrictive environment as Student could make adequate educational progress in the existing mix of classes.

65.     The District convened an IEP meeting on April 19, 2006, to discuss the District's offer of placement and services for the remainder of SY 2005-2006, and for the next school year. The parties did not finish discussion of the IEP on April 19, 2006, and finished the IEP meeting on May 31, 2006. Ms. Rose accompanied Mother to both meetings, and Student attended on April 19, 2006. At the April 19, 2006 IEP meeting, Ms. Morga presented the results of her assessment and Ms. Pfeiffer and Mr. Haynes presented Student's progress on three academic goals. Mary Forbord, Student's English teacher, attended the May 31, 2006 IEP meeting. The District agreed to Mother's request at the IEP meeting and switched Student's case carrier to Ms. Fanoe. Mother did not consent to the District's IEP at the end of the IEP meeting.

*Adequacy of Proposed Accommodations and Modifications and Goals*

66.     By April 19, 2006, Student had not met her study skills goal because she still required prompts to bring required materials to class, to maintain her academic calendar and to maintain focus in class. Student had improved over the year as she required less prompting, but the District needed to modify the goal needed to provide Student with additional assistance. Student met her consumer math skills goal. However, Student required prompts and redirection from Mr. Haynes or the class aide to remain on-task during class and to complete her work. Finally, Student exceeded her reading goal as she could identify 80 percent of the time with no prompts the main idea in the text and statements in the text that supported the main idea. Mr. Haynes and Ms. Pfeiffer testified credibly regarding the progress that Student had made since the beginning of the school year. The evidence did not establish that Student failed to make the level of progress on her goals that the District reported. Hence, Student did not establish that she failed to make adequate progress on her IEP goals.

67.     At the time of the April 31, 2006 IEP meeting, Student was receiving a C- in English, C in consumer math, B in individual studies, and A in culinary arts and physical education. As noted in Factual Findings 127 through 130 below, Student did not establish that her grades did not accurately reflect her educational capabilities. Regarding Student's educational progress, Ms. Forbord reported that Student was doing well in her English class with the instructional aide support and accommodations, but that she needed to ensure that Student understood class directions and the aide wrote down class instructions. The District did not dispute at the IEP meeting that Student required assistance with modeling more age-appropriate social interactions. Additionally, Student required multiple presentations and constant checking to ensure that she understood the class instruction, plus requiring Student to rephrase or restate presented information to ensure understanding.

68.     The District proposed continuing Student's speech and language goals from the January 31, 2006 IEP meeting, with new goals for study skills, math, written expression and social interaction. The District modified the prior study skills goal to include minimal prompting from staff, instead of Student not requiring any prompt, to meet the goal. The change recognized Student's limitations and her need for additional assistance to ensure that she brought the required materials to class and to organize her classwork and assignments. Based on persuasive testimony from Mr. Haynes and Ms. Pfeiffer and Student's academic progress, this goal was appropriate to meet Student's unique needs, and adequately addressed her cognitive, attention and organization deficits. Additionally, the District's proposed goal was sufficiently specific regarding the skills Student needed to acquire and measurable on how the District was to determine her progress.

69.     Due to Student's satisfactory progress in her consumer math class, the District proposed that she attend a special education algebra class, taught by Mr. Haynes. This class teaches in two years the one-year regular education algebra class. The District's proposed math goal focused on Student solving single variable algebraic equations that involved multiplication, division, subtraction and addition with 80 percent accuracy. Additionally, Student would learn more complex equations involving integers and rational numbers and graph linear equations. Student asserted that, based on Dr. Wolk's assessment, she did not have the cognitive ability to perform such high level math. On the WJTCA-III that Mr. Haynes administered, Student had a standard score of 90, 25th percentile, on the math calculation subtest, and standard score of 93, 31st percentile, on the math fluency subtest, which indicated that Student can perform higher level math than what Dr. Wolk believed. Credible testimony from Mr. Haynes established that Student learned in her consumer math class the skills that she needed to perform algebra. The evidence did not include any subsequent testing that demonstrated that Student could not perform basic algebra equations. Finally, the District's proposed math goal was sufficiently specific regarding the skills Student needed to acquire to perform the algebraic equations and measurable as to determining her progress.

70.     The District's proposed a written expression goal replaced the speech and language goal that had Student work on similar skills. The proposed written expression goal had Student write a three paragraph essay, with four to five sentences per paragraph. The goal also focused on teaching Student to write coherently, to support her ideas with relevant evidence and to answer 'wh' questions using proper grammar and punctuation. The District's goal followed Dr. Wolk's December 2005 recommendations to teach Student 'wh' questions so she could independently evaluate material she read, and teaching her strategies to organize her writing. The evidence did not establish that Student's cognitive, attention and organizational deficits would have interfered with her meeting the District's proposed written expression goal. Despite Dr. Wolk's opinion of Student's inability to succeed in a regular education class, Student was able to pass her freshman English class, which indicated that she had the ability to meet the District's proposed written expression goal. In light of all of the above, the District's proposed written expression goal was reasonably calculated to meet her unique needs. Additionally, the District's proposed goal was sufficiently specific

regarding the writing skills Student needed to acquire and how the District was to determine her progress.

71.     The District proposed a social interaction goal for Student to demonstrate appropriate behavior in varied school situations. Student's social interaction had improved since the beginning of the year; she got along with her classmates and had made friends. However, Student still had problems interacting appropriately with peers, especially making inappropriate comments to which the peers negatively reacted. The District also proposed that Student attend a social skills group, and Ms. Curnow would continue to assist Student with her pragmatic language deficits during the speech and language sessions. Testimony from Ms. Curnow, Ms. Pfeiffer and Mr. Haynes established that this goal and services adequately addressed her social skills deficits. Finally, Student did not establish that this goal was not sufficiently specific or measurable. Therefore, the District's proposed social skills goal appropriately addressed Student's social skills deficit.

72.     Regarding Student's pragmatic language deficits, the District did not propose a specific pragmatic language goal. However, the District met Student' pragmatic language needs with the direct speech and language services, especially the social skills group where Student would work on pragmatic language skills. Additionally, the District's social interaction goal worked on Student's deficit in appropriately interacting with other students, which involved pragmatic language skills, such as being able to read another student's body language and speaking appropriately to the person. The District's goal to have Student ask 'wh' questions assisted her in responding to and asking questions in regular conversation, a pragmatic language skill. Finally, Ms. Rose did not raise at the IEP meeting nor testify at hearing that that Student required a specific pragmatic language goal to make adequate educational progress, or that the District's speech and language services were not adequate. Therefore, Student did not establish that she required a specific pragmatic language goal to receive a FAPE, or that the District's speech and language and social interaction goals did not meet her unique needs.

73.     The District did not propose any changes to the accommodations and modifications that it provided Student in the January 31, 2006 IEP. As noted above, Student made adequate progress to meeting her goals, and achieved good grades in her regular education and special education math class, despite her contention at hearing that she did not have the cognitive, language and attention skills to succeed. Because Student continued to make adequate educational progress from the January 31, 2006 IEP, the evidence did not establish that the District needed to make any changes in its proposed accommodations and modifications.

*Student's Request for an Entire SDC Program*

74.     Student asserted that she required a more restrictive setting to receive a FAPE than the District's offer. A school district is required to place a special education student in the least restrictive environment in which he or she can be satisfactorily educated. An analysis of the least restrict environment must consider four factors: (1) the educational

23

benefits to the child of placement full-time in a regular class; (2) the non-academic benefits to the child of such placement; (3) the effect the disabled child will have on the teacher and children in the regular class; and (4) the costs of educating the child in a regular classroom with appropriate services, as compared to the cost of educating the child in the district's proposed setting.

75.     The District proposed to continue the same mix of regular and special education classes for Student, and explicitly offered in the IEP an instructional aide for Student in her regular education classes. Additionally, the IEP stated that the independent studies teacher would consult with each of Student's regular education teachers ten minutes per week. On the IEP, the District wanted to change Student's program designation from SDC to RSP because Student attended less than half of her school day in special education classes or services. Mother objected to the change in designation because she mistakenly believed that the change in designation would lessen the services that the District provided Student. Mother believed that the change in designation meant that the District thought Student required fewer services. At the IEP meeting, the District told Mother that the District was not decreasing Student's services by changing Student's designation. The District was going to change the designation to specialized academic instruction (SAI) for all special education students because a student should not be labeled SDC or RSP because of the level of service when the more important issue is whether the placement and level of services are appropriate to meet a student's unique needs. Because the District did not propose to decrease the special education services and supports in the IEP, Mother's objection was not supported by the facts.

*Educational Benefit to Student*

76.     Student contended that she needed smaller, more specialized class instruction to make adequate educational progress due to her cognitive, and expressive and receptive language deficits, and problems with attention and working memory. However, as noted above, Dr. Wolk and Mother underestimated Student's academic abilities, given that Student made adequate progress in her regular and special education classes with the additional supports the District provided. While Student needed the additional help of a math special education class due to her significant math deficits, Student did not require additional special education classes with accommodations and modifications, especially in light of the instructional aide in her regular education classes. The accommodations and modifications allowed Student to remain on-task during her regular education classes and to benefit from the class instruction. Student's contention that she may have made additional progress in smaller, special education classes is not the appropriate standard to determine the proper placement as the District is only required to ensure that Student received an adequate, not maximum, educational benefit. While Student contended that she was not benefiting educationally from her regular education classes, Student's grades and progress on her goals prove otherwise.

24

*Non-Educational Benefit to Student*

77.    Student asserted that she lacked the social skills and pragmatic language abilities to properly interact with her typically developing peers in a regular education classroom, and therefore would receive little non-educational benefit from those classes. Additionally, Student asserted that, due to her safety deficits, she was at undue risk for exploitation by her peers. As with Student's academic abilities, Dr. Wolk and Mother underestimated Student's abilities to make friends and to care for herself at school. When Student started SHS, she did not mingle with other students and was quite reserved. As noted above, as the school year progressed, Student became more comfortable with her peers and interacted with them more frequently. While Student cut class, her conduct was typical of other regular education students. The evidence did not establish that Student's cutting class created a safety issue that required a one-to-one aide to constantly monitor her. Additionally, because of Student's pragmatic language and social skills deficits, she required the interaction with typically developing peers in a regular education setting to learn the skills on how to interact with others once she left school. Therefore, Student received non-educational benefits in the proposed regular education classes.

*Disruption and Cost*

78.    Student's attention and pragmatic language deficits could sometimes cause Student to be disruptive in class, because she occasionally made inappropriate comments to her classmates or teacher or spoke at an improper time. However, Student's conduct was minimally disruptive to the class, because Student's instructional aide easily redirected Student and kept her on-task. None of Student's regular education teachers complained to Mr. Haynes or Ms. Pfeiffer that Student's conduct unduly disrupted their classes. Finally, neither side raised cost as an issue regarding whether the District could properly instruct Student in a regular education classroom.

79.    A balancing of interests favored the District's proposed mix of regular and special education classes for Student. Student received adequate educational benefits being educated in regular education classes with the accommodations and modifications the District provided, along with the other supports and services. Student needed to learn how to interact with non-disabled peers, and her ability to properly interact with others improved during the course of the school year. Finally, Student's did not unduly disrupt the regular education classroom, nor impose any financial hardship to the District. Therefore, the least restrictive environment for Student to receive a satisfactory education was the District's proposed class mix.

*Adequacy of November 6, 2006 Changes to the April 19, 2006 IEP*

80.    The District scheduled an IEP meeting for September 26, 2006, in response to Mother's August 29, 2006 request. The District was implementing the April 19, 2006 goals

25

as Mother consented in correspondence with the District during the summer.[10]  Mother
expressed concern in the August 29, 2006 letter that Student did not have an instructional
aide in her regular education classes.  Mother cancelled this IEP meeting because her then-
attorney, Mara Rosen, could not attend.  The District rescheduled the meeting for
November 6, 2006, per Mother's request.  Mother attended the November 6, 2006 IEP
meeting with Ms. Rosen and Ms. Rose.  The SY 2006-2007 school year started on
August 23, 2006, and the District did not immediately provide Student with an instructional
aide for regular education class due to scheduling issues with the aides.  By early September
2006, the District provided Student with an instructional aide for her classes.

81.     A month into SY 2006-2007, Student was having a lot of difficulty in her
English class, and was receiving a D grade.  District representatives, including Student's
English teacher John Miller, instructional aide Marlene Hlebo, Ms. Fanoe and Ms. Jones-
Powers, met on September 26, 2006, to discuss Student's progress in her English class.  At
this meeting, the District staff agreed to provide Student additional assistance to address her
memory, attention, and receptive language deficits.  The aide or Mr. Miller would provide
Student with visual reminders to keep her on-task, checking with Student to make sure that
she understood the instructions and classwork, and that complex information would be
broken down into small bits that would be easier for Student to understand.  The District
would also provide Mother with weekly progress reports.  The District's discussion of
Student's problems in her English class and additional modifications and accommodations
show that the District was responsive to Student's needs, and would make needed changes
based on Student's unique needs.  At the November 6, 2006 IEP meeting, District staff
discussed with Mother the changes that the District made at the September 26, 2006 meeting.

82.     At the November 6, 2006 IEP meeting, the parties discussed Student's use of a
highlighter on tests, providing Student with a second set of books for home, Mother's safety
concerns, and issues regarding Student's designation as a SDC versus SAI student.  The
District agreed to permit Student to use a highlighter, including on the CAHSEE, and to
provide Student with a second set of books.  The District continued to explain to Mother that
the District's request to change Student's designation from SDC to SAI was purely a
semantic change because Student's program would not change with the name change.
Regarding Student's safety, Mother raised the same concerns as at the prior IEP meeting
about Student's safety on campus and again requested a one-to-one aide.  Before the IEP
meeting, Mother raised a concern about another student creating a "MySpace"[11] webpage
about Student and putting false information about Student.  Mother did not adequately

---

[10] Student attempted to raise as an issue for hearing whether the District violated Parents' procedural rights
by implementing the April 19, 2006 goals.  However, Student did not raise this issue in the Third Amended
Complaint.  In any event, Mother consented to the goals in her correspondence with the District during the summer
of 2006 and never objected to the District's implementation of the goals, even when the District presented Student's
progress on the goals in subsequent IEP meetings.

[11] MySpace is an internet social networking website that allows users to create webpages about themselves
and to share this information with other MySpace members.  Because MySpace does not verify the identity of the
person who posts the webpage information, it is extremely easy for a person to create a false MySpace webpage
pretending to be another person.

26

explain why she expected the District to handle this situation, instead of Mother speaking to the other child's parents, given that Mother knew who the student who posted the false MySpace information, and given that this issue occurred outside of school.

83.     Regarding Mother's continuing request that Student have a full-time special education classload, the District again responded that Student's existing mix of classes provided her with some educational benefit in the least restrictive environment. For the second semester of SY 2005-2006, Student's grades showed that she made adequate progress in her classes. Student received a C in English, Bs in consumer math, individual studies and vocal music, and As in culinary arts and physical education.

84.     Due to Mother's concern about Student's lack of social skills, the District amended the April 19, 2006 IEP and created a goal for Student to join an extra-curricular club. However, Mother and Ms. Rose did not raise any other information not brought forth in prior IEP meetings regarding their concerns that the District failed to address Student's unique safety needs. Mother continued to insist that the District not place Student in regular education classes and provide Student with a fulltime aide.

85.     Student's unique needs had not changed since the April 19, 2006 and May 31, 2006 IEP meetings, and pursuant to Factual Findings 80 through 84 the IEP developed was reasonably calculated to provide Student with some educational benefit in the least restrictive environment and developed considering all relevant information regarding Student's unique needs. At the November 6, 2006 IEP meeting, the District considered all the information provided by Student's IEP team and her progress and problems at school, and made needed changes to her educational program. In light of all of the above, the November 6, 2006 IEP addendum offered Student a FAPE.

*Adequacy of the March 13, 2007 IEP to Meet Student's Unique Needs*

86.     The District continued to implement the April 19, 2006 goals, and the extra-curricular goal added at the November 6, 2006 IEP, with no objection by Parents. The District continued to implement these goals, and Mother and Ms. Rosen did not raise any objection to the District's implementation at the November 6, 2006 IEP meeting. Additionally, Mother gave her consent to the District's added goal at the November 6, 2006 IEP meeting subsequently, and Student participated in the Future Farmers of America with Mother's consent.

*Ms. Rispoli's School Observation*

87.     At Mother's request, Ms. Rispoli observed Student at SHS on December 12, 2006 in her math, English, world history and individualized studies classes, and prepared a report that Mother provided to the District. Ms. Rispoli's observation found that Student was off-task in her classes and required constant redirection, had trouble getting started on assignments in her classes and would doodle drawings instead of taking notes or working on a class assignment. Ms. Rispoli also concluded that Student had minimal interaction with her

classmates. Ms. Rispoli did not believe that the District provided Student with adequate
special education instruction during her individualized studies class. However, the problem
with Ms. Rispoli's conclusion that the District did not meet Student's needs is that
Ms. Rispoli did not properly observe Student and misunderstood Student's individualized
studies class. Additionally, she overemphasized her observations regarding Student's
performance in her world history class.

88.    Ms. Rispoli did not properly conduct her observation of Student. Student
knew that Ms. Rispoli was observing her because Ms. Rispoli sat very close to Student
during the observation, which made Student uncomfortable and explained why Student
appeared guarded during Ms. Rispoli's observation. Since Ms. Rispoli has known Student
for many years, it would difficult for Student not to notice Ms. Rispoli. Therefore,
Ms. Rispoli's presence caused Student and others in classroom to act unnaturally, and thus
led Ms. Rispoli to reach inaccurate conclusions.

89.    Ms. Rispoli's report does not establish any problems in Student's math class,
which had 13 students in class that day. The report states that Student participated
appropriately in class, and worked on her class assignment with minor off-task behaviors,
such as doodling and playing with her hair. After math class, another student approached in
the hallway, and they talked for a couple of minutes, which supported the District's
contention that Student had friends and could interact appropriately with classmates.

90.    Student then went to her English class after the morning break. During this
class, other students made presentations, and Student attentively watched the presentations.
Student was more interested in visual presentations, which corresponds to her visual learning
strength. Student was attentive during the class after the presentations when Mr. Miller made
a slideshow presentation and followed the class instruction to open the book. Nothing in
Ms. Rispoli's observation established that the District did not meet Student's needs in this
class.

91.    Student's next class was world history. Ms. Rispoli observed the most off-task
behaviors by Student during this class, which had 29 students in class that day. The teacher,
Stephen Goodbody, began the class with a lecture, and then had the class watch a movie and
answer questions on worksheet. Student's instructional aide told Ms. Rispoli that Student
typically did not pay attention in class and doodled a lot in her notebook. During
Ms. Rispoli's observation, Student did not answer questions on the worksheet, and the aide
did not attempt to keep Student on-task to complete the assignment.

92.    Ms. Rispoli's report does not mention whether she observed Student during
lunch. Ms. Rispoli did not observe Student's after-lunch health class. The next class
observation was Student's individualized studies class, which had 14 students that day.
Ms. Rispoli criticized this class for not providing Student with specific special education
instruction. However, Ms. Rispoli misunderstood the purpose of the class, which was to give
Student additional time to complete other class assignments and to receive assistance from
the teacher, Angela Calendar, or one of Student's instructional aides, not to receive

28

generalized classroom instruction. Also, a regular or special education teacher sometimes came into the class to provide assistance. Student received adequate academic support in her individualized studies class because it focused on providing additional, individualized assistance for her other classes.

93.     Mother has consistently requested that the District provide Student with a fulltime aide out of class because she believed that Student's safety deficits put her at risk to exploitation and harm. Ms. Rispoli's observation only includes a discussion about Student speaking with a schoolmate during the morning break, and nothing about Student during lunch or Student having problems getting from class to class. Nothing in Ms. Rispoli's observation established that Student required a one-to-one aide outside of class.

94.     Ms. Rispoli's observations confirmed that Student had problems staying on-task and that she required a classroom aide for her regular education classes. The fact that Student was off-task during her world history class did not mean that the District failed to meet Student's unique needs. Particularly given that Ms. Rispoli did not review Student's classwork, or speak to the teacher about Student's progress or off-task behavior, Ms. Rispoli's testimony did not establish that Student did not receive adequate educational benefit in her world history class, or any other class.

95.     Ms. Rispoli's school observation only provided a snapshot of one day. Because she did not speak to Student's teachers or review her classwork regarding her progress, Ms. Rispoli never examined whether Student was or was not receiving adequate instruction and assistance from the District to meet her unique needs. Additionally, Ms. Rispoli's observations established that Student could safely maneuver by herself around SHS as Ms. Rispoli did not note any problems.

*March 13, 2007 IEP Meeting*

96.     The IEP team met on March 13 and 28, 2007. For the March 13, 2007 IEP meeting, Ms. Fanoe met with Student's teachers and reviewed the prior IEPs. As Student's case carrier, Ms Fanoe spoke regularly with Student's teachers and aides during the school year, and observed Student in her classes and on campus. She developed Student's present levels of performance and prepared two organization/transition goals and three written language goals. Ms. Fanoe, along with Mr. Haynes, developed two math goals. In addition to information from Student's speech and language sessions, Ms. Curnow obtained information from Mr. Miller regarding Student's speech and language needs in class, and drafted three speech and language goals for the IEP meeting. The District was not proposing any change to Student's mix of regular and special education classes, nor speech and language services and teacher consultation. Mother attended the March 13, 2007 IEP meeting by herself.

97.     At the time of March 13, 2007 meeting, the team members discussed Student's first semester grades. Student received a C in her algebra and English classes, B in world history, and A in animal plant science, health and individual studies. However, at the time of

29

the IEP meeting her grades had faltered as she had an F in algebra and C- in English as she was not doing her classwork and cutting classes. The District team members stated that Student's social behaviors were still a little immature for age. Student had friends she hung out with during lunch, but did not seek interaction with her peers in her regular education classes. Mother again raised issues regarding Student's safety on campus. The IEP team members discussed Student's present levels of performance and the proposed goals, and IEP team members raised concerns that the proposed written language goals were too ambiguous.

98. Ms. Curnow prepared a two page synopsis of Student's progress and areas of continued weakness. Student made improvement in identifying parts of an essay, such as topic sentences and sentences that support the writer's position, but still had difficulty extracting information from her reading and organizing that information into her essays. Student still had problems with her attention and a tendency to rush through assignments, but her ability to focus had improved. Student had the ability to appropriately retain focus when doing a preferred activity and actively discussed the material. Student had difficulty motivating herself to complete her class assignments, and the risk of failing a class would jolt Student into completing her classwork, being more attentive and improving her grades. Based on Ms. Curnow's recommendations, the District proposed that Student's present accommodations and modifications be continued to keep Student on-task and that constant monitoring is needed to ensure that Student understood the class instruction, used her study aides, such as flash cards and visual reminders, and completed her assignments.

99. Most importantly, during her speech and language sessions, Student demonstrated the ability to learn from her mistakes regarding her behavior and interactions with her schoolmates. Ms. Curnow discussed with Student problems that Student was having at school. Ms. Curnow explained to Student why her conduct was not appropriate and how to better resolve an interpersonal problem. Student used the techniques that Ms. Curnow worked on with Student and Student did not repeat that mistake. Additionally, Student had the ability to self-analyze her problems and recognize her faults, which indicated a higher level of executive functioning than Dr. Wolk believed Student capable of achieving.

100. Because the District needed to revise the goals based on the IEP team comments, the IEP team reconvened on March 28, 2007. At this meeting, Ms. Rose and Ms. Rosen accompanied Mother. Ms. Fanoe met with Student on March 27, 2007, and went over the proposed goals and ITP. Mother again raised concerns about Student's decision making and safety. Mother also raised concerns about Student's progress in meeting her goals. The IEP team members discussed the District's proposed goals, and further revised the goals based on information provided by Ms. Rose. Based on the comments raised by Student's IEP team members, the District included a pragmatic language goal for Student to understand the consequences of her actions.

*Present Levels of Performance*

101. Student challenged the present levels of performance contained in the March 2007 IEPs, especially Student's progress on her goals from the April 19, 2006 IEP.

30

Ms. Fanoe credibly testified that she obtained Student's present levels of performance on her goals on her academic and social goals by speaking with Student's teachers as to each goal, except for the math goal where she only consulted with Mr. Haynes. Student had not met her study skills goal; she was not always writing all her assignments in her calendar, and her school binders were disorganized. However, Student did bring required materials to class. While Student did not meet her writing goal, she made significant progress in being able to write a grammatically correct, organized three-paragraph essay, with supporting ideas, although she still needed assistance from her aide. Student met her social interaction goal as she demonstrated appropriate behavior on campus, and met her transitional skill goal by joining the Future Farmers of America. Student did not meet her math goals, because while she could do the required equations, she made too many mistakes by rushing through her work and not double-checking for accuracy.

102. Ms. Curnow also presented Student's present levels of performance regarding the speech and language goals, and Student's progress as described in her two page synopsis. During the individual speech and language sessions, Student could properly summarize a short story read to her. However, Student still had trouble transferring this skill to her regular education classes. Student had not met the goal for her to answer 'wh' questions after reading a four-paragraph passage, but had made significant progress.

103. Although Student finished her essay comparing *All Quiet on the Western Front* and *The Diary of a Young Girl* on April 23, 2007, she started working on the essay by turning in a rough draft March 7, 2007. The final essay showed that Student, with the assistance of her aide and support from Mr. Miller, could write a well-organized essay with an introduction, topic sentences, supporting information for the reading material and a conclusion. Ms. Hlebo testified that her assistance to Student consisted of getting Student to draw out information from the books, and to discuss with Student how to organize the information, but that she did not write the essay for Student. Ms. Rose, who provided homework assistant, and Mother, did not state that Student did not write this essay. Student received an A- for her essay, which showed her progress on her writing goal.

104. Ms. Fanoe and Ms. Curnow discussed the present levels of performance at the IEP meetings, and none of Student's team members raised any objection. Additionally, Mother, Ms. Rose and Ms. Rispoli did not identify at hearing any errors in the District's present levels of performance. In light of all of the above, the March 2007 goals were based on accurate present levels of performance.

*Adequacy of Student's Goals*

105. The District modified the April 19, 2006 written language goal and broke it down into smaller components. One goal focused on Student writing an outline, with minimal assistance, for a paragraph to assist her in organizing her thoughts. The next writing goal was for Student to write, with minimal assistance, a paragraph with a topic sentence, supporting ideas and information to support the ideas. The final writing goal then had Student write an organized three paragraph essay, with an introduction, body and conclusion,

31

with minimal assistance. The purpose of all three writing goals was for Student to learn the skills to write an essay for the CAHSEE.

106.    Student took the CAHSEE on March 20, 2007, with the accommodations in her IEP, and the results were received at the end of the school year. While Student did not obtain a passing score of 350 on the language arts section, she did extremely well with a score of 333, only 17 points shy of passing. Student's near-passing score indicated that she possessed greater ability than Dr. Wolk opined in her testimony and 2005 report, given that Dr. Wolk believed that Student's borderline intelligence would prohibit her from passing the CAHSEE, even by her senior year. Student's CAHSEE score indicated that she had made progress in the District's program and was working towards graduating with a regular diploma. Finally, the evidence established that the District's proposed goals were sufficiently specific regarding the writing skills Student needed to acquire and how the District was to determine her progress.

107.    The District continued the math goal for Student to solve with 80 percent accuracy tests involving addition, subtraction, division and multiplication of integers and rational numbers. Additionally, the goal proposed that Student solve single step algebraic equations with 80 percent accuracy. The purpose of the both goals was to reduce the errors that Student made by rushing through her work, and for Student to possess the skills needed to pass her class and the CAHSEE. As with Student's written language goals, Dr. Wolk believed that Student was not capable of performing algebraic equations in the District's goal due to her low cognitive functioning and attention deficits. However, Student could perform the mathematical functions, and her inability to meet the goal came derived from her attention and organizational deficits that caused her to rush and not double-check her answers. Additionally, Student's algebra class for SY 2007-2008 would teach her more material that is on the CAHSEE. While Student did not have the same level of success on the math portion of the CAHSEE, she did obtain a score of 306, with 350 needed for passage. Finally, the evidence established that the District's proposed math goals were sufficiently specific regarding the math skills Student needed to acquire and how the District was to determine her progress.

108.    The District proposed as a goal to continue working on Student's organization skills through an academic calendar that included homework assignment and tracking when completed and submitted. Student did not present sufficient evidence that her attention, organization and cognitive deficits were so severe that she could not independently keep track of her assignment or required more intensive help than the District provided. Additionally, the evidence established that the proposed goal stated specific regarding Student's maintenance of her notebook how the District was to determine her progress.

109.    The District's proposed speech and language goal regarding understanding a passage required Student to do more analysis as to the meaning of the passage, including understanding inferences and figurative language, and answering questions regarding the meaning of the passage. This goal was appropriate for Student because her ability to move beyond concrete thinking, and to understand for subjective information, improved during the

2006-2007 school year, especially with the assistance of Ms. Curnow and Mr. Miller. Student's April 23, 2007 essay indicates that she was beginning to go beyond just the concrete meaning of a novel by being able to analyze the characters' need for human contact and love. Additionally, Student's essay showed higher executive functioning ability than Dr. Wolk believed Student capable. The District also proposed to continue working on Student's receptive language by having her extract information from her textbooks and to analyze and organize the information.

110.    To work on Student's expressive language and problem solving, the District proposed that Student discuss with the speech and language specialist commonly-faced situations and how to resolve those situations. For pragmatic language, Student would keep a social journal, which she would discuss with the speech and language specialist for Student to understand the consequences of her conduct and how to improve. These skills were important to Student due to social skills deficits and failure to consider the consequences of her actions. Both these goals also addressed issues regarding Student's safety for Student to consider her conduct in cutting classes. None of Student's IEP team members indicated that the District's proposed speech and language goals were not adequate to meet Student's unique needs. Additionally, the evidence established that the proposed goals were sufficiently specific or measurable.

111.    Further supporting the adequacy of the District's proposed goals are the goals adopted by Riverview, a private school in Massachusetts for special education students with an average class size of three to eight students. Student started attending Riverview in late September 2007, because Parents did not believe that the District was providing Student with a FAPE at SHS. Riverview created goals for Student and its goals were substantially similar to the District's proposed written language, speech and language, social skills and math goals. The only additional goals that Riverview had for Student were specific to her science and history classes and their course curriculum, and a goal for activities of daily living. However, Ms. Brenner, the Riverview director, could not state how the Riverview goals were substantially different than the District's proposed goals, and how its goals, and not the District's goals, met Student's needs. Dr. Patterson observed Student at Riverview in October, 2006. Based on Student's Riverview IEP and Dr. Patterson's observations, Student's classes went beyond teaching her learning activities of daily living skills, and were not remedial in nature. Student's Riverview classes included history, science, English, and algebra, and were more complex than Dr. Wolk stated Student was capable of achieving.

112.    Student contended that the District's proposed goals did not meet her unique needs because her deficits were more severe than the District believed. However, the District properly determined Student's present levels of performance and created goals based on that information, teacher input, Student's progress at school, and the prior assessments. Based on the above Factual Findings, the District's proposed goals adequately addressed her cognitive deficits, attention problems, social deficits, expressive, receptive and pragmatic language deficits and safety issues, and were reasonably calculated to allow Student to make adequate educational progress. Additionally, the evidence established that the District's proposed goals were sufficiently specific and measurable.

*Need for SDC Program*

113.    Mother continued to insist that Student required a program in which her entire class schedule consisted of small, special education classes, and a full-time aide to shadow Student outside of class.  Mother continued to believe that Student was at risk at SHS, and that Student's cognitive, social skills and attention deficits did not allow her to make adequate educational progress in her regular educational classes.

114.    Mr. Miller, Mr. Ironside and Mr. Goodbody all testified regarding Student's behavior and academic progress in their classes.  All credibly testified that Student was not disruptive in class and the instructional aide could easily redirect Student when she did not pay attention to class instruction.  While Student continued to have problems remaining focused in class, the District was aware of this problem and continued to work with Student to keep her on-task in class.  Student herself recognized her problems, especially when informed that she would not pass a class if she continued not to do her school work and not pay attention in class, which caused her to improve her grades.  Student finished the 2006-2007 school year with a C in algebra, Bs in English, world history and health, and As in animal plant science and individualized studies.

115.    Student was cutting more classes at the time of the March 13, 2007 IEP meeting.  Student would leave campus with her friends and her conduct negatively impacted her educational progress.  The District was aware of Student's conduct and attempted to work with Student.  Student's cutting of class and leaving the campus did not create a safety risk that required the District to have an aide constantly shadow Student.  The District eventually disciplined Student in April 2007, by requiring her to attend two Saturday school sessions.  After the District disciplined Student, her attendance and grades improved and she did not again cut class, which indicated that she possessed the executive functioning ability to learn from her mistakes.

116.    Pursuant to Factual Findings 75 through 79, 113, 114 and 115 and the teacher's testimony, the evidence did not establish that Student required a more restrictive placement to meet her unique needs.  Student continued to make adequate educational progress in her regular education classes with accommodations, modifications and supports that the District provided.  Student did not establish that she lacked the cognitive, attention, organization and language skills to make adequate educational progress in the mix of regular and special education that the proposed, which was the same as the prior two school years.  Student received non-educational benefits by interacting with general education students as she made friends and learned to interact with others.  Therefore, Student did not require a more restrictive educational setting.

*Student's Need for Goals In Adaptive Skills Related to Self-Help and Daily Living Skills Goals*

117.    Student alleged that the District needed to develop specific goals regarding adaptive skills related to self-help and daily living skills based on information provided by

34

Mother and Dr. Wolk in her assessments. When Student entered the District, none of the prior school or private assessments indicated that Student required specific goals to address her adaptive skills related to self-help or daily living skills. Dr. Wolk's 2002 assessment stated that Student had deficits regarding her executive functioning skills, which impacted her ability to perform activities of daily living. However, Dr. Wolk did not state that Student required any special instruction regarding her adaptive skills. Additionally, the 2003 MCOE psychoeducational assessment did not identify that Student required adaptive skills goals, and Mother did not raise this concern at either the May 24, 2005 or October 25, 2005 IEP meetings.

118.   Dr. Wolk's December 5, 2005 assessment report is the first mention that Student required goals to address her adaptive skills deficits. Dr. Wolk made specific recommendations that Student required an educational program that focuses on skills related to activities of daily living. However, Dr. Wolk's 2005 assessment did not provide sufficient information about why Student required this type of educational program. Dr. Wolk's discussion regarding Student's executive functioning deficits and her ability to perform activities of daily living tasks in her 2005 assessment is nearly identical to the discussion in the 2002 assessment. However, Dr. Wolk's assessment did not provide any information from Parents regarding Student's ability to perform activities of daily living. Additionally, Dr. Wolk did not cite any information from teachers who responded to her questionnaire that indicated that Student had deficits regarding activities of daily living or self-help skills that required specific goals.

119.   At hearing, Mother mentioned that Student lacked the ability to perform simple tasks, such as being able to order, pay for and count change in a retail purchase. As noted previously, Mother consistently underestimated Student's abilities. However, no information from Mother as to Student's inability to perform such age-appropriate tasks were included in Dr. Wolk's report, or Ms. Morga's parent interview in her April 18, 2006 report or at the April 19, 2006 and May 31, 2006 IEP meetings. Mother's July 20, 2006 response to Dr. Morga's assessment does not mention any deficits regarding her daily living skills. Mother did not mention at the later November 6, 2006 or March 13, 2007 IEP meetings that Student required activity of daily living goals. Finally, neither Ms. Rose nor Ms. Rispoli mentioned in any IEP meeting any specific examples from their experiences over many years working with Student that evidenced that Student required activity of daily living goals. Therefore, the evidence did not establish that Student required goals specifically designed for activities of daily living.

120.   Student asserted that the District needed to provide goals for self-help skills because of her safety awareness, expressive and receptive language deficits, which made it harder for Student to ask for assistance, and her attention and organization deficits, which limited her ability to perform simple tasks. As noted previously, the District's IEPs adequately addressed these deficits in SY 2005-2006, SY 2006-2007 and 2007-2008, and Student did not provide adequate evidence that showed that she had any self-help deficits. Therefore, Student did not establish that she required self-help goals.

35

*Student's Accommodations and Modifications, Including a Trained Aide*

121.    Student asserted that the District failed to provide her with adequate accommodations and modifications to address her unique needs. Student further contends that she required a fulltime aide to shadow her on campus due to her inability to protect herself. Additionally, Student argued that the instructional aides that the District provided for her regular education classes that it did not adequately train.

122.    As determined above, the District did not provide Student with an instructional aide for Student in her regular education classes when she started SY 2005-2006 as the May 24, 2005 IEP did not require the District to provide an instructional aide. Due to Mother's requests and problems Student had during the first month of school due to her attention, memory and receptive and expressive language deficits, the District provided Student with an instructional aide in her regular education classes. While the District did not list the instructional aide as a service on either the October 25, 2005 or January 31, 2006 IEPs, the meeting notes for the October 25, 2005 IEP state that the District was providing Student with an aide. The District trained Student's aides and, according to credible testimony from Mr. Haynes and Ms. Pfeiffer, the aides worked with Student in her regular education classes and provided assistance in her independent studies class. Therefore, the evidence did not establish that the District failed to adequately her instructional aides or that the aides failed to provide her with needed assistance.

123.    For SY 2006-2007, the District stated in the April 31, 2006 IEP that it would provide Student with an instructional aide for her regular education classes. Pursuant to Factual Finding 80, Student did not have instructional aides for the first week or two of SY 2006-2007 while the District worked out assignments for the aides. After this initial period, the District provided Student with aides and Ms. Fanoe trained the aides to address Student's needs. Ms. Fanoe monitored the aides and spoke to Student's teachers regarding the aides. Student's English teacher, Mr. Miller, world history teacher, Mr. Goodbody, and health teacher, Mark Ironside, all testified persuasively that Student's instructional aide in their classroom appropriately kept Student on-task, redirected her when needed, took notes and provided academic assistance when needed. One of the aides, Marlene Hlebo, Student's instructional aide for English, testified and established that she provided Student with the required supports, such as note taking, making sure Student understood the day's instructions, organizational assistance and additional support during her independent student's class. Finally, Student contended that one of the aides did not speak adequate English. However, there was no credible evidence that the aide could not be understood. Therefore, the evidence did not establish that the District failed to provide Student with adequate instructional aides during SY 2006-2007.

124.    For SY 2007-2008, the District proposed to continue the prior accommodations and modifications from the prior IEPs. Based on Student's grades, progress on her goals and testimony by her teachers, Student made adequate progress on her goals and class grades with these accommodations and modifications during her sophomore year.

36

Therefore, the District's proposed accommodations and modifications in the March 2007 IEP were reasonably calculated to allow Student to make adequate educational progress.

125. For SY 2005-2006, SY 2006-2007 and SY 2007-2008, Student contended that the District needed to provide her with a full-time aide outside of class for her protection due to her cognitive, attention and pragmatic language deficits, impulsivity, and lack of social skills that placed her safety at risk. As noted above, District staff observed that Student had no problem going class to class and interacting with classmates during breaks and at lunch. While Student did cut classes in SY 2005-2006 and SY 2006-2007, her conduct did not represent a safety threat. Moreover, the District appropriately addressed the issue by talking to Student and finally forcing her to attend Saturday school in April 2006. After Student attended Saturday school, she did not cut class again and her grades improved. Additionally, the fact that Student's cognitive ability was in the low average to borderline range according to Dr. Wolk did not mean by itself that Student lacked safety awareness. Finally, at noted in Factual Findings 30, 36 and 37, Dr. Wolk never observed Student at school nor included the teacher comments in her 2005 assessment, and therefore could not credibly state whether the District needed to provide Student with a full-time aide for her safety.

126. In addition to the instructional aide, the District provided Student such accommodations and modifications as preferential class seating, additional time for Student to complete assignments and test, modifications to class assignments and tests, having a set of books for home and school, and teachers using multiple modalities to present classroom instructions. The District developed these accommodations to meet Student's unique needs because she needed preferential class seating due to attention deficits, and additional time and modification of class assignments and tests due to her attention, organization and language deficits. Presenting Student with information with different modalities, such as visually and relating the instruction to real life examples, addressed recommendations made in Dr. Wolk's 2005 report. Additionally, District teachers implemented these accommodations and modifications in Student's class. Mr. Haynes and Ms. Fanoe gave Student's teachers copies of her IEP and discussed with the teachers the accommodations and modifications Student required. Additionally, Mr. Haynes and Ms. Fanoe regularly spoke with Student's teachers during the school year and assisted the teachers in any additional accommodations and modifications Student might require. Therefore, the evidence established that the accommodations and modifications in Student's IEPs met her unique needs and the District implemented these while Student attended SHS.

*Accuracy of Student's Grades in SY 2005-2006 and SY 2006-2007*

127. Student asserted that the District inflated her grades without Parents' permission to make it appear that Student was making adequate educational progress. Student also contended that she did not earn the grades noted in her transcript because the District modified her general education curriculum, homework and tests so she was not doing the same work as her typically developing peers.

37

128.    The evidence did not establish that the District modified Student's grades in SY 2005-2006 without Parents' permission.  Mother consented to the IEPs in effect during this school year that permitted the District to modify Student's curriculum, homework and tests as an accommodation and modification due to her unique needs.  Mr. Haynes provided Student's general education teachers a copy of Student's IEP, which the teachers implemented with the accommodations and modifications.  The fact that District teachers gave Student more time to complete homework assignments and tests or modified assignments, such as having Student answer fewer questions than her classmates, to accommodate her memory, attention, organization and auditory processing deficits, does not mean that Student did not earn the grades noted in her transcript.  Additionally, Student did not establish that she lacked the cognitive ability to earn those grades, as Student's average grades were consistent with her low average cognitive functioning.  Therefore, the District did not modify Student's grades in SY 2005-2006 without Parents' permission to make it appear that Student made adequate educational progress.

129.    For SY 2006-2007, Student's classes were harder because she took tenth grade regular education courses and a special education algebra class that taught the one year regular education class in two years.  Mr. Miller, Mr. Goodbody, and Mr. Ironside all credibly testified that Student earned the grades reflected in her transcript for her classes and that they did not inflate Student's grades.  Mr. Miller went over a rough draft and final five paragraph essay that Student turned in that showed that Student was capable of producing grade equivalent classwork with the assistance of her instructional aide and accommodations and modifications, such as additional time to complete the assignment.  Student's essay showed that Student had the ability complete a five paragraph essay needed for the CAHSEE, which Dr. Wolk did not believe that Student was capable of completing.  Additionally, the fact that Mr. Miller gave Student half of the vocabulary words for the weekly test than her classmates was a reasonable accommodation due to her deficits that made it hard for Student to recall of the words for the weekly quiz.

130.    After consulting with Ms. Fanoe, Mr. Ironside used performance based activities, such a developing projects and presenting these to the class, to determine Student's progress and her understanding of the classroom instruction.  Student worked on the same class materials as other students and she took the same tests as other students and earned her grades in the health class.  In world history, Student did the same work as her classmates and completed written work that was at a tenth grade level.  Mr. Goodbody noticed that not only did Student's classwork improve over the school year, and that Student turned in her work timelier and worked more productively in class.  Student's grade was based on tests and assignments.  While Student received more time to complete her tests, Mr. Goodbody graded Student's work the same as her classmates.  Finally, as noted above, Student could perform the Algebra in her special education class and earned the grade noted in her record.  Therefore, Student did not establish that the District inflated her grades as Student was capable of performing to the level noted in her grades with the accommodations and modifications that the District provided.

38

*Adequacy of the District's Transition Plans for SY 2005-2006, SY 2006-2007 and SY 2007-2008*

131.    As stated in Legal Conclusion 33, beginning not later than the IEP that will be in effect when a student receiving special education reaches 16 years of age (or younger, if the IEP team deems it appropriate), an IEP must include a statement of transition services to be provided to the student. The statement must contain appropriate postsecondary goals that are based upon age-appropriate transition assessments. The goals should relate to training, education, employment, and, where appropriate, independent living skills for a student after high school. The statement of transition services assumes greater importance as a student nears graduation and post-secondary life. The failure to include an adequate statement of transition services for a student is a procedural violation, which may constitute a procedural denial of FAPE if the violation impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decisionmaking process regarding provision of a FAPE, or caused a deprivation of educational benefits.

132.    The District offered Student an ITP at the May 24, 2005 IEP meeting because Student had only attended a small Montessori school, and spent little time at the Washington middle school. However, this ITP is outside the two-year statute of limitations, as noted in Factual Finding 13 above.

133.    In December 2005, the District prepared a vocational guidance report for Student. The District interviewed Student, reviewed her school history, assessment test results and reports of observations of Student. Student stated that she performed chores around the house, could count money and make change, and enjoyed being around people. The guidance report recommended as possible employment law enforcement, elementary school teacher, waitress, physical therapist and public relations. The report also suggested that Student look into work experience and exploration offered through the school, and enroll in the District's Transition Partnership Program during her senior year. Finally, the report recommended that Student become a client of the Department of Rehabilitation for continued supportive services after high school.

134.    The District developed another ITP for Student for the April 19, 2006 IEP. Even though Student was not yet 16, she would turn 16 a month into the next school year. Student contended that the April 2006 ITP was not adequate because the District should have developed the ITP to address independent living skills and vocational training due to her cognitive deficits. The April 2006 proposed ITP focused on Student's graduation requirements, including the requirement of 20 hours of community service. The ITP did not focus on Student exploring job choices and independent living skills. The District normally provided intensive vocational education, transitional services, including applying to a community college and independent living skills during a student's senior year. Student had the cognitive ability to succeed academically at SHS, and did not require an education program focused on teaching her adaptive and activities of daily living skills. Therefore, Student's educational program was properly focusing on her academics and graduation requirements as a sophomore. Moreover, the evidence did not establish that she lacked the

basic ability to care for herself appropriately for a 15 year old child. Accordingly, the evidence did not establish that the April 2006 ITP was inadequate to meet Student's needs.

135.    Ms. Fanoe prepared an ITP for the March 13, 2007 IEP meeting, and discussed it with Student on March 27, 2007, before the IEP reconvened the next day. Student indicated a preference for retail sales. The District's proposed ITP still focused on Student taking academic classes during her school day and, during her senior year, moving towards more vocational training and learning skills for life after high school.

136.    Student challenged the March 2007 ITP for not offering intensive transitional skills in light of her deficits in daily living and self-help skills. Student attempted to show that she required the intensive transitional skills training that Riverview provides. However, the evidence did not support that contention; instead, Riverview waits for a student to meet its academic requirements before moving to its intensive transitional living skills program.

137.    The ITP's focus on academics in Student's junior year was designed to address her educational needs, to allow her to meet her graduation requirements. Hence, Student's argument to the contrary does not succeed. Additionally, Student did not establish that she had significant deficits in daily living and self-help skills that required that the District provide her with intensive transitional skills training in her junior year. Similarly, the evidence established that the District's transitional skills program was designed to meet her unique needs related to transitional skills in her senior year. Based on all of the above, the District's March 2007 ITP was designed to meet her unique needs related to transitional skills.

CONCLUSIONS OF LAW

*Burden of Proof*

1.    Under *Schaffer v. Weast* (2005) 546 U.S. 49 [126 S.Ct. 528, 537, 163 L.Ed.2d 387, 399], the party who filed the request for due process has the burden of persuasion at the due process hearing. Student filed for this due process hearing and bears the burden of persuasion by the preponderance of the evidence.

*Did the District deny Student a FAPE in SY 2005-2006 school year because it developed the IEPs without properly considering information from prior assessments and failed to address Student's deficits in the areas of low cognitive skills, attention problems, social deficits, pragmatic language deficits and safety issues?*

2.    Before any action is taken with respect to the initial placement of a special education student, an assessment of the student's educational needs must be conducted. (Ed. Code, § 56320.) In California, a district assessing a student's eligibility for special education must use tests and other tools tailored to assess "specific areas of educational need" and must ensure that a child is assessed "in all areas related to" a suspected disability, such as vision,

hearing, motor abilities, language function, general intelligence, academic performance, communicative status, self-help, orientation and mobility skills, career and vocational abilities and interests, and social and emotional status. (Ed. Code, § 56320, subds. (c), (f).)

3.    In *Board of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley* (1982) 458 U.S. 176, 200 [102 S.Ct. 3034] (*Rowley*), the Supreme Court recognized the importance of adherence to the procedural requirements of the Individuals with Disabilities in Education Act (IDEA). However, pursuant to title 20 of the United States Code section 1415(f)(3)(E)(ii), a procedural violation of IDEIA does not deny the student FAPE unless it 1) impedes the student's right to FAPE; 2) significantly impedes a parent's opportunity to participate in the educational decision-making process; or 3) causes a deprivation of educational benefits. (See, *W.G. v. Board of Trustees of Target Range Sch. Dist. No. 23* (9th Cir. 1992) 960 F.2d 1479, 1484.)

4.    Pursuant to California special education law and the IDEIA, children with disabilities have the right to a FAPE that emphasizes special education and related services designed to meet their unique needs and to prepare them for employment and independent living. (Ed. Code, § 56000.) FAPE consists of special education and related services that are available to the student at no charge to the parent or guardian, meet the state educational standards, include an appropriate school education in the State involved, and conform to the child's IEP. (20 U.S.C. § 1402(9).) "Special education" is specially designed instruction, at no cost to parents, to meet the unique needs of the student. (20 U.S.C. § 1402(29).)

5.    Likewise, California law defines special education as instruction designed to meet the unique needs of individuals with exceptional needs coupled with related services as needed to enable the student to benefit fully from instruction. (Ed. Code, § 56031.) The term "related services" includes transportation and such developmental, corrective, and other supportive services as may be required to assist a child to benefit from special education. (20 U.S.C. § 1402(26).) In California, related services may be referred to as designated instruction and services. (Ed. Code, § 56363, subd. (a).)

6.    School districts receiving federal funds under IDEIA are required by title 20 of the United States Code, section 1414(d)(1)(A)(i), to create an IEP for each child with a disability that includes: (1) a statement regarding the child's then-present levels of academic achievement and functional performance; (2) measurable annual goals, including academic and functional goals designed to meet the child's educational needs and enable the child to make progress; (3) a description of how the child's progress will be measured; (4) a statement of the special education and related or supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child; (5) a statement of the program modifications or supports that will be provided; (6) an explanation of the extent to which the child will not participate with nondisabled children in the regular class; and (7) other required information, including the anticipated frequency, location, and duration of the services. (See also, Ed. Code, § 56345, subd. (a).)

41

7.      In *Rowley*, the United States Supreme Court addressed the level of instruction
and services that must be provided to a student with disabilities to satisfy the requirement of
the IDEA. (*Rowley, supra,* 458 U.S. 176, 200.) The Court held that a student's IEP must be
reasonably calculated to provide the student some educational benefit, but that the IDEA
does not require school districts to provide the best education available or to provide
instruction or services that maximize a student's abilities. (*Id.* at pp. 198-200.) The Court
stated that school districts are required to provide only a "basic floor of opportunity" that
consists of access to specialized instructional and related services, which are individually
designed to provide educational benefit to the student. (*Id.* at p. 201.) De minimus benefit or
trivial advancement, however, is insufficient to satisfy the *Rowley* standard of "some" benefit.
(*Walczak v. Florida Union Free Sch. Dist.* (2d Cir. 1998) 142 F.3d at p. 130.) Rather, a
child's academic progress must be viewed in light of the limitations imposed by his or her
disability and must be gauged in relation to the child's potential. (*Mrs. B. v. Milford Bd. of
Educ.* (2d Cir. 1997) 103 F.3d 1114, 1121.)

8.      To determine whether a district offered a student a FAPE, the analysis must
focus on the adequacy of the district's proposed program, not the parents' proposed
alternative. (*Gregory K. v. Longview School Dist.* (9th Cir. 1987) 811 F.2d 1307, 1314.) An
IEP is evaluated in light of information available at the time it was developed; it is not
judged in hindsight. (*Adams, etc. v. Oregon* (9th Cir. 1999) 195 F.3d 1141, 1149.)[12] It must
be evaluated in terms of what was objectively reasonable when the IEP was developed.
(*Ibid.*) If the district's program was designed to address the student's unique educational
needs, was reasonably calculated to provide student some educational benefit, and comported
with student's IEP, then the district provided a FAPE, even if the parents preferred another
program and even if the preferred program would have resulted in greater educational
benefit. (*Gregory K. v. Longview School Dist.* (9th Cir. 1987) 811 F.2d at p. 1314.) School
districts are also required to provide each special education student with a program in the
least restrictive environment, with removal from the regular education environment
occurring only when the nature or severity of the student's disabilities is such that education
in regular classes with the use of supplementary aids and services could not be achieved
satisfactorily. (20 U.S.C. § 1412(a)(5)(A); Ed. Code, § 56031.)

*July 2005 Transition Plan*

9.      The IDEA allows states to determine the time by which a request for due
process hearing must be filed. (20 U.S.C. § 1415(b)(6)(B.) California law provides that
a request for a due process hearing "shall be filed within two years from the date the party
initiating the request knew or had reason to know of the facts underlying the basis for the

---

[12] Although *Adams* involved an Individual Family Service Plan and not an IEP, the Ninth Circuit Court of
Appeals applied the analysis in *Adams* to other issues concerning an IEP. (*Christopher S. v. Stanislaus County Off.
of Educ.* (9th Cir. 2004) 384 F.3d 1205, 1212.) Further, District Courts within the Ninth Circuit have adopted the
*Adams* analysis in evaluating IEPs. (See, e.g., *Pitchford v. Salem-Keizer School Dist. No. 24J* (D.Ore. 2001) 155
F.Supp.2d 1213, 1236.)

request." (Ed. Code, § 56505, subd. (l); see, *Miller, etc. v. San Mateo-Foster City Unified Sch. Dist.* (N.D.Cal. 2004) 318 F.Supp.2d 851, 860-61.)[13]

10.    Pursuant to Factual Finding 13, the District did not modify the May 24, 2005 IEP in July 2005, and the May 24, 2005 IEP provided for Student's transition to high school. Because Student filed the due process complaint on July 6, 2007, the two-year statute of limitations prevents Student from alleging violation that occurred before July 6, 2005 because Student did not establish any exceptions to the statute of limitations. Therefore, the two-year statute of limitations bars Student's claims about the May 24, 2005 IEP.

*October 25, 2005 IEP*

11.    Student contended that the District failed to consider information from prior assessments and failed to address Student's cognitive, attention, social skills, pragmatic language and safety deficits. Pursuant to Factual Findings 18 through 22, and 29, the District considered all relevant information at the October 25, 2005 IEP meeting. While the District did not have the prior assessments at this IEP meeting because the prior school district had not forwarded them, the prior school district and the District had considered these assessments at the May 24, 2005 IEP meeting. Additionally, in determining whether to make changes to the IEP, the District consider information provided by Mother, which included information from the prior assessments, and information regarding Student's progress at SHS during the first two months of SY 2005-2006.

12.    Pursuant to Factual Findings 22 through 29, the District's proposed changes to the IEP met Student's unique needs and were reasonably calculated to allow her to make adequate educational progress. Student did not have significant safety deficits; she could safely move around campus, and her "missing" status on September 28, 2005, was caused by Ms. Curnow simply failing to inform others that she was taking Student out of class for an assessment. Mother overreacted regarding Student being alone with another classmate, who did not represent any threat to Student. Based on Student's school performance, the District provided Student with an instructional aide in her regular education classes to address her attention and working memory deficits. The District also wanted to conduct a speech and language assessment to determine Student's needs, especially in these areas of pragmatic, expressive and receptive language. However, Mother refused to consent because she wanted Dr. Wolk to assess Student before she allowed the District to assess Student. Additionally, Mother thwarted the District's attempt to meet again to discuss Mr. Haynes proposed goals. Finally, even if the District had Student's prior assessment, pursuant to Factual Findings 4 through 6, Dr. Wolk's and Washington's assessments did not establish that the District needed to make further changes than proposed on and subsequent to October 25, 2005 to provide Student with FAPE. The assessments did not prove that Student had such significant

---

[13] In 2006, the Legislature amended the statute to reduce the existing three-year limitations period to two years. The change went into effect on October 9, 2006, and affected all requests for due process hearing filed after that date. (See, Ed. Code, § 56505, subd. (l) (text of section operative until October 9, 2006).)

cognitive, speech and language, safety impairments or social skills deficits that required further changes.

*January 31, 2006 IEP*

13.     Student contended that based on Dr. Wolk's December 2005 assessment that the District needed to make significant changes to her IEP to address Student's cognitive, attention, social skills, pragmatic language and safety deficits. However, pursuant to Factual Findings 30 through 38, Dr. Wolk overestimated Student's deficits because Dr. Wolk failed consider progress at SHS in her report, and did not conduct further testing to determine the severity of Student's executive functioning and adaptive skills deficits. Additionally, Dr. Wolk did not provide any real life examples from either Mother or the teacher questionnaires that established that Student did not have the cognitive ability to perform adequately in regular education classes with additional supports to address her attention, organization and working memory deficits. Pursuant to Factual Findings 46 and 47, the District did consider information provided by Student's IEP team members and Dr. Wolk's assessment. The District was not required to submit to all of Student's IEP team requests.

14.     Pursuant to Factual Findings 48 through 50, Student made adequate educational progress during the first semester, and her ability to attend improved with the instructional aide, classroom accommodations and modifications, and assistance in Student's individualized studies class. Additionally, Pursuant to Factual Findings 39 through 45, 51 and 52, the District did determine that Student had pragmatic language and social skills deficits, and proposed adequate goals in these areas. The District's inclusion of a social skills addressed Student's unique needs. Finally regarding Student's safety needs, pursuant to Factual Findings 46 through 52, the District met Student's unique needs. Student did not show any problems at school regarding her safety, and Dr. Wolk's assessment did not establish that Student could not attend SHS without a fulltime one-to-one aide. Therefore, the evidence did not establish that the January 31, 2006 IEP did not meet Student's unique needs and not reasonably calculated to provide Student with some educational benefit.

*Did the District deny Student a FAPE in SY 2005-2006, SY 2006-2007 and 2007-2008 because it placed Student in a RSP classroom that had too many students, and in regular education classes, in which Student could not obtain an adequate educational benefit due to her cognitive, attention and social skills deficits?*

15.     In addition, federal and state law requires school districts to provide a program in the least restrictive environment to each special education student. (See 34 C.F.R. §§ 300.114, et seq. (2007); 34 C.F.R. §§ 300.550, et seq. (1999).) A special education student must be educated with nondisabled peers "[t]o the maximum extent appropriate," and may be removed from the regular education environment only when the nature or severity of the student's disabilities is such that education in regular classes with the use of supplementary aids and services "cannot be achieved satisfactorily." (§ 1412(a)(5)(A); 34 C.F.R. §§ 300.114(a) (2007); 34 C.F.R. § 300.550(b) (1999).) A placement must foster maximum interaction between disabled students and their nondisabled peers "in a manner

44

that is appropriate to the needs of both." (Ed. Code, § 56031.) The law demonstrates "a strong preference for 'mainstreaming' which rises to the level of a rebuttable presumption." (*Daniel R.R. v. State Bd. of Ed.* (9th Cir. 1989) 874 F.2d 1036, 1044-1045; see also, § 1412(a)(5)(A); *Rowley, supra,* 458 U.S. at p. 181 n.4; *Poolaw v. Bishop* (9th Cir. 1995) 67 F.3d 830, 834.)

16.     In *Sacramento City Unified School District v. Rachel H.* (9th Cir. 1994) 14 F.3d 1398, 1400-1402, the Ninth Circuit held that the determination of whether a particular placement is the "least restrictive environment" for a particular child involves an analysis of four factors, including (1) the educational benefits to the child of placement fulltime in a regular class; (2) the non-academic benefits to the child of such placement; (3) the effect the disabled child will have on the teacher and children in the regular class; and (4) the costs of educating the child in a regular classroom with appropriate services, as compared to the cost of educating the child in the district's proposed setting. However, the Supreme Court has noted that IDEA's use of the word "appropriate" reflects Congressional recognition "that some settings simply are not suitable environments for the participation of some handicapped children." (*Rowley, supra,* 458 U.S. at p. 197.)

17.     For SY 2005-2006, pursuant to Factual Findings 22 and 48 through 50, Student did not establish that the District had too many students in her RSP, individualized studies, and class. Ms. Pfeiffer and Student's instructional aides provided Student with sufficient individualized attention focused on helping Student with her classwork and meeting her IEP goals. For SY 2006-2007, pursuant to Factual Findings 66, 69, 75, 80 and 92, Student again did not establish that there were too many students in her individualized studies class as Student made adequate educational progress with the support that Ms. Calendar and the aides provided. Additionally, Student's cognitive and attention deficits were not so significant that she required a smaller individualized studies class to make adequate educational benefit. Finally, for the District's proposed IEP for SY 2007-2008, pursuant to Factual Findings 97 and 101 through 104, Student did not establish that she required an individualized studies class with fewer students to make adequate educational progress as she made adequate educational progress in her sophomore year.

18.     For SY 2005-2006, SY 2006-2007 and SY 2007-2008, Student also contended that the District failed to address her cognitive, social skills, safety, and speech and language deficits because Student required an exclusively SDC instruction to meet her unique needs. For SY 2005-2006, pursuant to Factual Findings 22 and 48 through 50, Student made adequate education progress in her regular education classes with an instructional aide and the accommodations and modifications. Additionally, Student did not establish that her cognitive, social skills, safety, and speech and language deficits were so significant that she could not obtain adequate educational benefit in her regular education classes. Mother's request for Student not to be in regular education classes was based upon Mother's belief that such placement would maximize Student's academic progress, and the mistaken belief that Student could not be safe in a regular education setting.

19.    For SY 2006-2007 and SY 2007-2008, the District continued to offer the same mix of regular and special education instruction. Pursuant to Factual Findings 31 through 38, Dr. Wolk's December 2005 assessment did not establish that Student needed solely SDC instruction to meet her unique needs. Dr. Wolk failed to consider in her report and testimony Student's educational progress at SHS, the services, goals and accommodations and modifications in Student's IEPs and teacher comments in making her conclusion. Additionally, Dr. Wolk failed to state whether she made her recommendation for Student to make adequate educational progress, or to maximize her potential. Finally, pursuant to Factual Findings 57 through 63, Ms. Morga's psychoeducational assessment correctly determined that Student's cognitive ability was in the low average range, and not the borderline range, and that Student could make adequate educational progress in regular education classes with adequate supports and services that addressed her unique needs.

20.    Additionally, pursuant to Factual Findings 74 through 79, 90, 91, 94, 95, and 113 through 116, Student did not establish that she required only SDC instruction and a fulltime one-to-one aide to make adequate educational progress in the least restrictive environment. Student made adequate educational progress, as reflected in her classroom grades and CAHSEE scores. Student's instructional aides kept her on-task in class and provided adequate academic support to address her attention, working memory and language deficits. The only class for which Student needed special education instruction was math, and Student established based on her progress in her consumer math class that she could succeed in algebra. The District also provided adequate accommodations and modifications, such as preferential seating, note taking assistance and additional time to complete assignments and tests, plus the support provided in Student's individualized studies class. Student also obtained significant non-educational benefit being with typically developing peers. Student had sufficient social and pragmatic language skills, and IEP goals and services that addressed her social and pragmatic language deficits, to properly interact with her regular education classmates and benefit from these interactions in and outside the classroom, including making friends at school. Student's conduct in her regular education classroom did not disrupt the classroom to interfere with the class instruction, nor impose any financial burden on the District. Finally, the District's proposal to change Student's designation from SDC to SAI was only a name change as the District never proposed changing the level of special education services. Therefore, the least restrictive environment for Student was the District's mix of regular and special education classes and services.

*Did the District deny Student a FAPE in SY 2005-2006, SY 2006-2007 and SY 2007-2008 because it failed to provide Student with accommodations and modifications designed to meet her unique needs, including a trained aide to accompany Student in her general education classes?*

21.    When a school district does not perform exactly as called for by the IEP, the district does not violate the IDEA unless it is shown to have materially failed to implement the child's IEP. (*Van Duyn v. Baker Sch. Dist. 5J* (9th Cir. 2007) 502 F.3d 811, 813.) A material failure occurs when there is more than a minor discrepancy between the services provided to a disabled child and those required by the IEP. (*Ibid.*)

46

22.     Student contended that the District failed to offer adequate accommodations and modifications to meet her unique needs during SY 2005-2006, SY 2006-2007 and SY 2007-2008, and that for SY 2005-2006 and SY 2006-2007 it failed to provide the accommodations and modifications identified in the IEP. For SY 2005-2006, pursuant to Factual Findings 18, 20, 21, 22, 25, 29, 122 and 125, the District provided Student with adequate accommodations and modifications in the October 25, 2005 IEP. The District considered that Student was struggling in her regular education classes. The District agreed to provide Student with an instructional aide to assist her in taking class notes, ensuring that Student understood the classroom instruction and to keep Student on-task. The District also agreed to provide Student with additional time for tests and class assignments. The District's accommodations and modifications adequately addressed Student's cognitive, attention, expressive and receptive language and organization deficits and permitted her to make adequate educational progress. Additionally, pursuant to Factual Findings 46 through 49, 54, 122 and 125, the District's accommodations and modifications in the January 31, 2006 IEP met Student's unique needs. Dr. Wolk's assessment did not establish that Student had such significant cognitive, language, attention, organization and social skills deficits that the District needed to provide Student with additional accommodations and modifications. Additionally, Dr. Wolk did not testify that the District's accommodations and modifications were not adequate to meet Student's unique needs, or that the District did not provide these accommodations and modifications.

23.     For SY 2006-2007, pursuant to Factual Finding 73, 122, 123 and 125, the District's proposed accommodations and modifications in the April 16, 2006 IEP were sufficient to meet Student's unique needs. The District continued the same accommodations and modifications from the January 31, 2006 IEP, and Student did not establish that Student's needs had changed that warranted any changes. Additionally, pursuant to Factual Findings 80 through 83, 85, 123 and 125, the District made adequate changes to Student's accommodations and modifications in the November 6, 2006 IEP, based on Student's progress during the first two months of her sophomore year and information provided by Mother before and during the IEP meeting. The District provided Student with additional support in her English class by breaking down the class instruction, homework and tests into smaller pieces that allowed Student to better comprehend her classwork. The District also allowed Student to use a highlighter on her tests to organize information, and provided Student with a second set of textbooks for home per Mother's request. Student did not establish that the District's accommodations and modifications did not adequately address her unique needs as Student made adequate progress in her classes and on her goals, or that the District did not provide these accommodations and modifications.

24.     For SY 2007-2008, the District proposed to continue the same accommodations and modifications that it was implementing. Pursuant to Factual Findings 101 through 104, 123 and 125, the District provided Student with adequate accommodations and modifications to meet her unique needs as Student made adequate educational progress during her sophomore year with these accommodations and modifications. Additionally, Student did not establish that her unique needs had changed since the last IEP to require additional accommodations and modifications.

47

25.     For SY 2005-2006, SY 2006-2007 and SY 2007-2008, Student contended that she required a fulltime aide to meet her unique needs because she could not safely be left alone on campus due to her cognitive, pragmatic language, social skills and safety deficits. Pursuant to Factual Findings 23, 29, 36, 48, 51, 53, 77, 89, 97, 99, 110, 115, and 122 through 124, Student did not establish that the District did not meet her unique needs. Student attended a very small Montessori school before Student attended SHS because Mother wanted to shelter Student. Mother only enrolled Student at SHS after she could not a private high school to accept Student because of her unique needs, and continued to recreate a private school environment at SHS. While Student did have problems with cutting class, the District addressed this problem by talking to Student and disciplining her. Additionally, Student never established that she was ever at risk on campus. Finally, Student did not present evidence that the District did not adequately train her instructional aides or that the instructional aides did not provide the required assistance. Therefore, Student did not establish she required a full-time, one-to-one aide, or that her instructional aides did not provide the required assistance.

*Did the District deny Student a FAPE in SY 2005-2006, SY 2006-2007 and 2007-2008 because it failed to develop goals to address Student's deficits in her adaptive skills related to her self-help and daily living skills?*

26.     Pursuant to Factual Findings 31, 33, 36, 56 through and 60, 117 through 120, and 127 through 130, Student did not establish that the District failed to develop goals to address her adaptive skills deficits. While Student did have cognitive deficits, her cognitive impairments were not at level of borderline mental retardation as Dr. Wolk opined. Student demonstrated during her freshman and sophomore years that she could make adequate educational progress in regular education classes, and could perform basic algebra equations in her special education math class. Further, Student came close in her sophomore year to passing the language arts section of the CAHSEE on her first attempt, which Dr. Wolk's 2005 report presumed she could not pass. Also, Mother, Ms. Rose, Ms. Rispoli and Dr. Wolk failed to present real life examples of Student not being able to perform activities of daily living. Finally, the goals that Riverview created for Student in September 2007 were remarkably similar to the District's proposed goals, and Ms. Brenner could not justify why Student required an activities of daily living goal based on her observation of Student.

*Did the District deny Student a FAPE in SY 2006-2007 and SY 2007-2008 because the IEP goals did not address Student's unique needs in academics, social skills, pragmatic language development and safety?*

27.     Student contended that the District failed to develop goals to adequately address her academic, social skills, pragmatic language development and safety needs during SY 2006-2007 and SY 2007-2008. Pursuant to Factual Findings 66 through 72, 83 and 84, the District's proposed goals in April 19, 2006 and November 6, 2006 IEP were adequate to meet Student's unique needs. Student cognitive ability was in the low average range, not borderline as Student contended, and the District's written expression, math, and study skills goals were sufficient to meet her academic needs. While Student had social skills and

48

pragmatic language deficits, these deficits were not so significant to prevent her from making friends at school and interacting appropriately with her peers most of the time. The District's proposed speech and language and social skills addressed Student's social skills and pragmatic language needs, and Mother, Dr. Wolk, Ms. Rose and Ms. Rispoli did not provide sufficient information how the District's goals did not meet Student's unique needs. Finally, Student did not have significant problems with her safety awareness that required the District to create a specific safety goal, plus the District's social skills and speech and language goals addressed improving Student behavior, which related to her safety awareness.

28.    For SY 2007-2008, Student's academic, social skills, pragmatic language development and safety needs did not change from the prior school as Student made adequate educational progress in her class and on her IEP goals. Pursuant to Factual Findings 107 through 112, Student did not establish that the District's proposed goals in the March 2007 IEP were insufficient to meet her unique needs. Additionally, testimony from Mother, Dr. Wolk, Ms. Rose and Ms. Rispoli did not establish that the District's goals failed to meet Student's unique needs based on Student's performance at school. Finally, the goals that Riverview created for Student in September 2007, were remarkably similar to the District's proposed goals, and were not remedial in nature. Therefore, the District's proposed goals were reasonably calculated to provide Student with adequate education progress as they addressed her unique needs.

*Did the District deny Student a FAPE in SY 2006-2007 and SY 2007-2008 because the IEP goals were not adequately specific and not measurable?*

29.    An IEP must include a statement of the child's present levels of educational performance; a statement of measurable annual goals; the manner in which the student's progress toward meeting the goals will be measured; when periodic reports on the progress toward meeting the goals will be made; the special education and related services, supplementary aids and services, and modifications or supports to be provided; and the date the services begin and their anticipated frequency, location, and duration. (20 U.S.C. § 1414(d)(1)(A)(i); 34 C.F.R. § 300.320(a); Ed. Code, § 56345, subd. (a).) An IEP that fails to contain the child's present levels of educational performance or objective evaluation criteria may be cured if the required information was known to the administrators and parents who participated fully in the development of the IEP. (*W.G. v. Board of Trustees of Target Range School Dist. No. 23, supra,* 960 F.2d at pp.1484-1485; *Cleveland Heights-University Heights City School Dist. v. Boss* (6th Cir. 1998) 144 F.3d 391, 399.) A district must make a formal written offer in the IEP that clearly identifies the proposed program. (*Union Sch. Dist. v. Smith* (9th Cir. 1994) 15 F.3d 1519, 1526.)

30.    Student contended that the District's present levels of performance in the April 19, 2006, November 6, 2006 and March 2007 IEPs were adequately specific and not measurable. Pursuant to Factual Findings 66 through 72 and 101 through 104, the District developed measurable goals that her specific regarding how the District was to measure Student's progress and when Student met the goal. Testimony from Mother, Ms. Rose and

Ms. Rispoli failed to establish that the proposed goals were not easily understandable, or that District staff failed to clarify any goals at their request during the IEP team meetings.

*Did the District deny Student a FAPE in SY 2006-2007 and SY 2007-2008 because the IEP goals were not based on Student's present levels of performance and her unique needs?*

31.     Student contended that the District's present levels of performance in the April 19, 2006 and March 2007 IEPs regarding her progress on her IEP goals were not accurate. Pursuant to Factual Findings 66 through 72 and 101 through 104, the District accurate determined Student's present levels of performance through the observations of Ms. Pfeiffer, Mr. Haynes, Ms. Curnow, Ms. Fanoe, Student's regular education teachers and information presented by Student's IEP team members. Testimony from Mother, Dr. Wolk, Ms. Rose and Ms. Rispoli did not establish that the District's present levels of performance were incorrect.

*Did the District deny Student a FAPE in SY 2005-2006 and SY 2006-2007 by modifying Student's grades, without Parents' permission, to inaccurately indicate that Student had made educational progress?*

32.     Pursuant to Factual Findings 127 though 129, Student did not establish that the District modified her grades during her freshman and sophomore years to inaccurately reflect that Student made adequate educational progress. The fact that the District provided Student additional time for tests and homework and received additional assistance with her instructional aide as part of her accommodations and modifications did not mean Student did not earn the grades on her transcript. Student's teachers established that in her regular education classes that had the same curriculum as her classmates, took the same tests and judged to the same standards. The only classwork submitted at hearing, Student's spring 2007 English composition, showed the progress Student made in her written expression skills, with complex and reasoned analysis regarding the characters' emotions. Finally, Ms. Rose, who tutored Student during her freshman and sophomore years, did not provide adequate evidence that Student could not perform at grade level based on her experiences tutoring Student.

*For SY 2005-2006, SY 2006-2007 and SY 2007-2008, did the District fail to develop adequate transition plans for Student as the transition plans were not tailored to Student's interests or unique needs and not designed to adequately prepare Student for post-secondary education or a vocational career?*

33.     Beginning not later than the IEP that will be in effect when a student receiving special education reaches 16 years of age (or younger, if the IEP team deems it appropriate), an IEP must contain a transition plan that contains appropriate measurable postsecondary goals based upon age-appropriate transition assessments related to training, education, employment, and where appropriate, independent living skills. The plan must also contain the transition services needed to assist the pupil in reaching those goals. (*Bd. of Educ. of*

50

*Township High Sch. Dist. No. 211 v. Ross* (7th Cir. 2007) 486 F.3d 267, 275-276; 34 C.F.R.
§ 300.320(b) (2007); Ed. Code, § 56345, subd. (a)(8)(A).)

34.    The District developed ITPs for Student first to assist her transition to high
school, and then to ensure that she made adequate progress to graduating with a standard
diploma by the end of her junior year to focus of Student's transition to life after high school
during her senior year.  As determined in Legal Conclusion 26, Student did not require an
educational program focused on teaching her activities of daily living and functional skills,
because she was capable of succeeding in a regular education class with the proper supports.
Therefore, the District properly developed ITPs that first focused on Student meeting her
graduation requirements, and then moved to teaching Student independent life and vocational
skills during her senior year, plus providing her with assistance in applying for post-
secondary education.


ORDER

Student's requests for relief are denied.


PREVAILING PARTY

Pursuant to California Education Code section 56507, subdivision (d), this decision
must indicate the extent to which each party has prevailed on each issue heard and decided.
The following findings are made in accordance with this statute:

The District prevailed on all Issues.


RIGHT TO APPEAL THIS DECISION

The parties to this case may appeal this decision to a court of competent jurisdiction.
If an appeal is made, it must be made within ninety (90) days of receipt of this decision. (Ed.
Code, § 56505, subd. (k).)


DATED:  March 28, 2008


_____
PETER PAUL CASTILLO
Administrative Law Judge
Special Education Division
Office of Administrative Hearings


51

# CIVIL COVER SHEET

JS 44 (Rev. 12/07) (cand rev 1-16-08)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

K.P. a Minor, by and through her Guardian ad Litem, C.P.

**DEFENDANTS**

SALINAS UNION HIGH SCH. DISTRICT

**(b)** County of Residence of First Listed Plaintiff  MONTEREY
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    MONTEREY
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Bob N. Varma (SBN 173508)
Varma & Clancy
5217 Orchid Ranch Ct.
Elk Grove, CA 95757

Attorneys (If Known)

Daniel Osher (Lozano Smith)    (831) 296-0500
4 Lower Ragsdale Drive, Ste. 200
Monterey, CA 93940-5758

C08 03076

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)    and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 864 SSID Title XVI | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 790 Other Labor Litigation | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | Security Act | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities— | ☐ 540 Mandamus & Other | **IMMIGRATION** | | Determination |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | Under Equal Access |
| | ☐ 446 Amer. w/Disabilities— | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus— | | to Justice |
| | Other | | Alien Detainee | | ☐ 950 Constitutionality of |
| | ☒ 440 Other Civil Rights | | ☐ 465 Other Immigration | | State Statutes |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
20 U.S.C. 1400 et seq., 20 U.S.C. 1415

Brief description of cause:
Appeal of an administrative decision in special education.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION    DEMAND $
UNDER F.R.C.P. 23

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE
"NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

☐ SAN FRANCISCO/OAKLAND    ☒ SAN JOSE

DATE  6/24/08

SIGNATURE OF ATTORNEY OF RECORD