1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                       NORTHERN DISTRICT OF CALIFORNIA

10                              SAN JOSE DIVISION

11

12   K.P., a minor, by and through C.P., her        Case No.  5:08-cv-03076-HRL
     Guardian Ad Litem,

13                    Plaintiff,                     **ORDER RE PLAINTIFF'S PETITION
                                                    FOR REVIEW**
14         v.

15   SALINAS UNION HIGH SCHOOL
     DISTRICT,

16

17                    Defendant.

18         Plaintiff K.P. filed this action alleging that the defendant Salinas Union High School

19   District (District) failed to provide her with a free appropriate public education (FAPE) as required

20   by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400, et seq.[1]  An

21   administrative law judge (ALJ) rendered a decision in the District's favor.  K.P. now seeks review

22   of that decision, contending that the ALJ erred in several respects.  The District maintains that the

23   ALJ's decision is correct and should be affirmed.  Upon consideration of the parties' moving and

24   responding papers, the oral arguments presented, and the entire administrative record,[2] this court

25   _____

26   [1] On December 10, 2015, Congress enacted the Every Student Succeeds Act ("ESSA"). See Pub.
     L. No. 114–95, 129 Stat. 1802 (2015).  The ESSA is a reauthorization of the Elementary and
27   Secondary Education Act of 1965 and includes amendments to the IDEA that are not relevant to
     this case.
28
     [2] KP's Third Amended Complaint ("TAC"), the operative administrative pleading, was not

United States District Court
Northern District of California

United States District Court
Northern District of California

1  denies the petition.

2  **STATUTORY FRAMEWORK**

3  Under the IDEA, all children with disabilities are entitled to a FAPE.  20 U.S.C. §

4  1412(a)(1).  A FAPE means special education and related services that:

5
6  (A) have been provided at public expense, under public supervision and
       direction, and without charge;

7  (B) meet the standards of the State educational agency;

8  (C) include an appropriate preschool, elementary school, or secondary
       school education in the State involved; and
9

10  (D) are provided in conformity with the individualized education program
        required under section 1414(d) of this title.

11  20 U.S.C. § 1401(9).

12  To achieve this purpose, the IDEA provides for a cooperative process between parents and

13  schools, culminating in the creation of an individual education plan (IEP) for every disabled

14  student.  20 U.S.C. § 1414; <u>Schaffer ex rel. Schaffer v. Weast</u>, 546 U.S. 49, 53, 126 S. Ct. 528,

15  163 L.Ed.2d 387 (2005).  The IEP "must include an assessment of the child's current educational

16  performance, must articulate measurable educational goals, and must specify the nature of the

17  special services that the school will provide."  <u>Schaffer</u>, 546 U.S. at 53.  Additionally, the IEP

18  must be "reasonably calculated to enable the child to receive educational benefits."  <u>Bd. of Educ.</u>

19  <u>of Hendrick Hudson Cent. Sch. Dist. v. Rowley</u>, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d

20  690 (1982).  Schools are required to provide "a 'basic floor of opportunity' to disabled students,

21  not a 'potential-maximizing education.'"  <u>J.L. v. Mercer Island Sch. Dist.</u>, 592 F.3d 938, 947 (9th

22  Cir. 2009) (quoting <u>Rowley</u>, 458 U.S. at 197 n. 21, 200).  The IDEA also requires that the IEP

23  allow the disabled student to receive an education in the "least restrictive environment."  This

24  means that schools are required to ensure that, to the maximum extent appropriate, a student with

25  disabilities is educated with nondisabled students, unless "the nature or severity of the disability of

26

27  included in the copy of the administrative record submitted to the court.  The District submitted a
    copy of the TAC with its opposition.  (See Osher Decl., Ex. A).  K.P. does not object to the
28  submission of the TAC or this court's consideration of it.

2

United States District Court
Northern District of California

1  a child is such that education in regular classes with the use of supplementary aids and services

2  cannot be achieved satisfactorily."  20 U.S.C. § 1412(a)(5)(A); see also 34 C.F.R. § 300.114

3  (same).

4       Parents have the right to participate in both the development and continued implementation

5  of their child's IEP.  20 U.S.C. § 1415(b).  If parents disagree with a school district regarding "any

6  matter relating to the identification, evaluation, or educational placement of the child, or the

7  provision of a free appropriate public education to such child," they are entitled to an impartial due

8  process hearing before a state agency.  20 U.S.C. § 1415(b)(6)(A), (f).  If the parents disagree with

9  the results of the administrative hearing before the state agency, an appeal may be brought in a

10  district court. 20 U.S.C. § 1415(i)(2)(A).

## BACKGROUND[3]

12       K.P., born in September 1990, was eligible for special education as a child with cognitive

13  abilities in the low average to borderline range; deficits in expressive, receptive, and pragmatic

14  language skills; attention deficits; difficulties in mathematic reasoning; and an auditory processing

15  disorder.  She also has a seizure disorder, circulatory problems, and poor short-term memory.

16       In June 2000, K.P.'s prior school district, Washington Union School District (WUSD),

17  assessed K.P. and concluded that she was eligible for special education services due to a disorder

18  in speech/language development.  (AR 770-779)  Parents declined WUSD's offer of services at

19  that time.

20       From kindergarten through eighth grade, K.P. attended a small, private Montessori school.

21  The Montessori school did not provide special education services.  Parents, however, had hired a

22  private instructional aide, as well as a speech and language therapist, who were permitted to work

23  with K.P. in the classroom.

24       Mother wanted K.P. to attend a learning disability high school and had not previously

25  considered putting K.P. in a public school.  However, the Montessori school only went to the

26  eighth grade, and there were no learning disability high schools in their area.  (AR 1559:6-16,

27  _____

28  [3] All citations to the administrative record are designated "AR."

3

United States District Court
Northern District of California

1661:5-7).  Parents had WUSD assess K.P. again in 2003; and, in December 2003, WUSD concluded that K.P. was eligible for special education services in speech and language.  (AR 123-127, 130-132).

In June 2004, WUSD prepared an IEP, which provided that K.P. would enroll full time at WUSD's San Benancio Middle School at the start of the 2004-2005 school year and would spend a little over half of her day (i.e., 185 minutes per day, 5 days per week) in special education class.  (AR 832-41).  However, Mother decided to keep K.P. in Montessori school for the first half of the school year and to do a transition to WUSD later in the year.  (AR 1562:5-14).

K.P. enrolled into WUSD in March 2005 and did not attend full time.  (AR 1670:16-20).  Instead, she arrived at lunch time and was there for less than half the day, attending regular education classes in history, physical education, and art, primarily for socialization and to ease her transition from Montessori school to a larger public school.  (AR 842-49; 1563:3-8, 12-15).

### A.    May 2005 IEP

On May 24, 2005, WUSD held an IEP meeting for K.P.'s transition to Salinas High School (SHS).  (AR 858-69).  Mother attended, along with Mary Rose,[4] K.P.'s private speech and language therapist who had worked with K.P. for several years.  Also in attendance were Karen Pfeiffer (an SHS special education resource teacher), Jean Bye (SHS speech/language specialist), and Mary Forbord (SHS general education teacher).

The May 2005 IEP offered to place K.P. in two special education classes for math and independent studies, for a total of 100 minutes per day (i.e., less than half the school day), five times per week.  Additionally, K.P. would receive speech and language services, twice per week, for 30 minutes per session.  For the rest of the school day, K.P. would be placed in general education courses, including English and a business technology class.  Accommodations included extra time, simplified directions, and on-task reminders for test-taking.  The May 2005 IEP also proposed goals for study skills, consumer math, and reading, as well as a plan to help K.P.'s transition to SHS.  The IEP did not expressly say whether KP would have the services of an

---

[4] Mary Rose is also referred to in the record as Mary Krieg.

United States District Court
Northern District of California

1  instructional aide in her regular education courses.

2      As of the May 25, 2005 IEP meeting, K.P. had been assessed several times.  Most of those

3  assessments, however, were several years old.  In February 2002, Parents privately retained

4  Rochelle B. Wolk, Ph.D. to conduct a neuropsychological evaluation.  (AR 785-802).  And, as

5  discussed, WUSD assessed K.P. in 2003.  In April 2005, Parents obtained a private assessment re

6  K.P.'s speech and language needs.  (AR 851-857).  There is no indication that Mother told the IEP

7  team about that assessment or presented it at the May 24, 2005 IEP meeting.  (AR 858-869).

8  Mother testified that she gave the April 2005 assessment to WUSD, not the District, believing that

9  the assessment would be transferred to the District when K.P. enrolled in SHS.  (AR 1672:6-25).

10  However, Nancy Jones-Powers, SHS Director of Special Education, testified that the April 2005

11  assessment was not in K.P.'s files received from WUSD.  (AR 2608:4-21).  And, Jean Bye wrote a

12  note in the IEP stating, "Since no speech/language information is available, [K.P.] will be given a

13  full evaluation during the first full month of the school term."  (AR 861).  It was agreed that goals

14  and objectives would be developed within the first month of the school year after K.P. had some

15  time to adjust to her new school and classes.

16      Mother approved the May 2005 IEP.

17      **B.**    **2005-2006 School Year**

18      K.P. enrolled at SHS in the Fall of 2005.  She was placed in special education classes for

19  consumer math and individual studies, as well as regular education classes for English and

20  business technology.

21      The District did not hold an IEP meeting within the first month of K.P.'s attendance at

22  SHS.  Charles Haynes, K.P.'s case carrier and consumer math teacher, did not know about the

23  agreement to hold an IEP meeting within the first month of school until he received a September

24  16, 2005 letter from Mother requesting an IEP meeting to discuss K.P.'s goals, the progress of her

25  current placement, and monthly meetings with her teachers.  In that letter, Mother also requested

26  that the District provide accommodations in K.P.'s regular education classes in the form of extra

27  time, modified assignments, and an in-classroom aide.  (AR 870; 1901:7-25).  Haynes responded

28  by letter on September 20, 2005, stating that he believed the May 2005 IEP was complete with

1    appropriate goals.  Haynes further stated that he would speak with the speech therapist that week

2    about whether K.P. needed a speech/language assessment to develop goals for her.  (AR 871).

3        It was around this time that the District realized that it had not received K.P.'s file from

4    WUSD.  The District requested the file and eventually received it; however, District staff testified

5    that the file contained only the May 2005 IEP and assessments that were several years old.  (AR

6    2606:18-2608:21).  Thus, the District says that it did not have sufficient information to determine

7    whether any changes to the May 2005 IEP were warranted.  (AR 1903:3-14, 2251:21-2252:11).

8        On September 23, 2005, Haynes presented Father with a triennial assessment plan.  (AR

9    873).  That plan not only proposed a speech/language assessment, but also recommended

10   academic, social/emotional, cognitive, perceptual/motor, and health tests.  The District said this

11   plan was prepared because SHS did not have any assessment information for K.P.  (AR 1902:22-

12   1903:14, 2610:23-2611:20).  Father initially consented to the assessment plan; but Parents later

13   rescinded their consent on September 28, 2005 and again requested an IEP meeting.  (AR 875-77).

14       The District thereafter held meetings and sent correspondence throughout the Fall of 2005,

15   requesting Parents' consent to assess K.P.  (AR 1956:18-1961:11, 880, 884, 889, 893, 912-17,

16   922-23).  However, Mother was again having K.P. evaluated by Dr. Wolk and did not want the

17   District to conduct any assessments until after Dr. Wolk's testing was done.  (AR 1590:13-21).

18   The District also asked for permission to communicate with K.P.'s private service providers, but

19   Mother did not consent.  (AR 913, 1683:8-24).

20   ***October 25, 2005 IEP***

21       An IEP meeting was held on October 25, 2005.  Mother requested an instructional aide,

22   expressing concerns about K.P.'s low cognitive abilities (based on Dr. Wolk's 2002 assessment),

23   as well as her social skills deficits.  (AR 27).  Mother also relayed concerns about K.P.'s safety.

24   (Id.).  These safety concerns were based on a September 28, 2005 incident where the District

25   could not locate K.P. on campus for over an hour.  During that time, K.P. was with Gisele

26   Curnow, an SHS speech and language therapist.  Curnow (who did not know that Parents

27   rescinded their consent for the District to conduct any assessments that very day) had taken K.P.

28   from class for an assessment, but forgot to sign K.P. out of class.  The District contacted Parents

United States District Court
Northern District of California

6

United States District Court
Northern District of California

while SHS staff looked for K.P., who eventually was found with Curnow. Mother's safety concerns also stemmed from a separate incident in which K.P. was found leaning on an older male student in a classroom during lunch. District staff told her that behavior was inappropriate, and she was never again found in an inappropriate situation with any male student. (AR 1746:14-1747:1, 1882:8-17, 1963:5-7).

At the October 25 meeting, the District staff reported that K.P. had significant problems with paying attention to classroom instruction, had difficulty with multiple step math and word problems, and was failing her business technology class. District staff also noted that K.P. was very shy, and did not mingle with other students. The District again proposed special education classes for 100 minutes per day, five times per week, and speech and language services, twice per week, for 30 minutes per session. (AR 21). Additionally, the IEP meeting minutes indicate that the IEP team discussed K.P.'s need for an instructional assistant, a one-on-one aide, the District's proposed assessments, and potential academic, social and organizational goals. (AR 21-27). Mother refused to sign the IEP and testified that, with respect to assessments, she would not have signed any IEP until after Dr. Wolk completed her evaluation. (AR 24, 1696:11-16).

On November 2, 2005, Haynes sent Parents a proposed contract with K.P. to help her make up for missed work in the business technology class. (AR 901-10). He also provided the prior reading, consumer math, and study skills goals from the May 2005 IEP, as well as new proposed goals re written expression, classroom behavior, and social interaction. (Id.). Haynes suggested discussing these matters at a November 7 IEP meeting. (Id.). On November 4, Mother advised that she was not available for a meeting on November 7. (AR 918).

### ***Dr. Wolk's 2005 Assessment***

As it turns out, November 7 was the first date of Dr. Wolk's assessment.

Dr. Wolk evaluated K.P. over several days in November and completed her assessment on December 5. (AR 144-161). In testing administered by Dr. Wolk, K.P. obtained a full scale IQ of 73, placing her in the 4th percentile. Dr. Wolk found that K.P.'s scores placed her in the borderline to low average range for cognitive functioning. She observed that K.P. had significant language delays with respect to her ability to follow verbal directions; an inability to maintain

7

1   focus and extract information; significant memory deficits (requiring that K.P. be given

2   information multiple times before she would understand it); expressive and pragmatic language

3   deficits; reading comprehension deficits; and executive functioning deficits that affected K.P.'s

4   ability to perform more mature thinking and problem solving.  In Dr. Wolk's opinion, K.P. could

5   not attend in a general education classroom due to her attention deficits.  Dr. Wolk made a number

6   of recommendations re K.P.'s education, including that K.P.'s math program should be limited to

7   simple consumer math, with a focus on pragmatics such as managing a debit card; and that she be

8   educated in a small classroom environment, with a focus on basic daily living and vocational

9   skills.  Additionally, Dr. Wolk felt that K.P. would be unable to meet grade appropriate

10  expectations for written expression and that her skills were likely to fall far below the level

11  required to pass the California High School Exit Exam (CAHSEE).

12          Meanwhile, the District filed for mediation to resolve the assessment issue, and the

13  mediation was scheduled for December 5.  (AR 919, 2612:7-16).  Parents' attorney wrote the

14  District stating, "We advised our clients to sign the assessment plan," and acknowledging that

15  "[t]he District understandably wanted proper assessments in order to provide appropriate

16  services."  (AR 943).  On December 5, the same day Dr. Wolk completed her assessment, Mother

17  signed a letter consenting to the District's proposed academic and speech/language assessments

18  (AR 942), which the District says was less than the comprehensive assessment for which consent

19  was sought.

20          By the end of the fall semester, K.P. received passing grades in all of her classes, primarily

21  B's and C's.  (AR 1232).  And, although she had been failing her business technology class (AR

22  892), and continued to struggle in it, she ended up receiving a D.  (AR 1232).

23          ***January 31, 2006 IEP***

24          In January 2006, Curnow conducted the District's speech and language assessment.  (AR

25  946-950).  She found that K.P.'s overall language skills were scattered between average and

26  significantly below average for her age.  However, Curnow believed that K.P.'s attention and

27  memory deficits may have negatively impacted K.P.'s test performance, such that the test scores

28  obtained did not accurately reflect K.P.'s true language skills and that K.P. could perform better

United States District Court
Northern District of California

8

United States District Court
Northern District of California

than the test results showed if she were attending to the matter at hand.  (AR 947, 2224:3-8).

Curnow observed that K.P. had a tendency to start doing an activity very quickly (sometimes starting before all the instructions were given) and to rush through the task without paying attention to the quality of her work.  Although K.P. was easily distracted, Curnow found that when prompted, K.P. was easily redirected to her task.

An IEP meeting was held on January 31, 2006 to discuss the District's assessments and Dr. Wolk's December 5 assessment, and K.P.'s program was revised.  (AR 974-988).

K.P. continued with special education classes for 100 minutes per day, five times per week, and speech and language services, twice per week, for 30 minutes per session.  However, K.P. was given additional speech and language services (50 minutes of speech and language consultation per month), as well as new speech and language goals.  She would be removed from the business technology class and placed in a culinary arts class.  Additionally, the IEP states that she would be given additional instructional support as necessary.  Mother consented to this IEP. (AR 975).

At the January 31 meeting, Mother requested that K.P. be placed in a social skills group, and the District agreed to explore what groups were available and appropriate for K.P.  About two weeks later, the District proposed that half of K.P.'s speech and language services be provided through an SHS social skills group.  (AR 990).  Although she did not sign an IEP that identified the social skills group, Mother agreed with the District's proposal; and, KP joined the group.  (AR 1725:1-1728:18, 2662:24-2663:2).

Additionally, on January 31, 2006, Mother consented to having the District conduct a comprehensive assessment of K.P.  (AR 972).  Reb Morga, a District school psychologist, conducted a psychoeducational assessment and found that K.P.'s cognitive abilities were in the low-average range and that K.P.'s full scale IQ was 81.  (AR 1044, 2398:9-2398:18, 2400:18-22). Nevertheless, the District maintains that K.P.'s academic achievement scores show that she is able to perform at a higher academic level than her IQ scores alone would indicate.  Here, the District points out that K.P.'s academic achievement scores were generally higher than 81, with several scores in the 90s.  (AR 1046).  Thus, the District believed that K.P. could learn and perform at a

United States District Court
Northern District of California

1   higher level than suggested by K.P.'s IQ scores and could succeed in a regular education

2   classroom with supports and accommodations.

3           Morga found that K.P. had strengths in letter-word identification, story recall, calculation,

4   math fluency, spelling, writing fluency, and handwriting.  (AR 1046).  She had learning disability

5   in applied problems, difficulty understanding directions, and cognitive weakness in visual-

6   auditory memory and symbolic reasoning.  (AR 1048, 1050).  K.P. also had attention deficit

7   hyperactivity disorder, as well as speech/language deficits revealed in prior assessments.  Morga,

8   however, did not find that K.P. had deficits in self-help and daily living skills.  (AR 2408:25-

9   2409:20).  She recommended that K.P. be given accommodations, such as preferential seating,

10  multisensory learning experiences, and as much visuals (e.g., visual outlines, graphic organizers)

11  as possible.  (AR 1051).

12          An IEP meeting was held in April and May 2006 to discuss the assessments and to review

13  K.P.'s progress on prior goals and objectives.

14  ***April 2006 IEP***

15          As in the January 31, 2006 IEP, the April 19, 2006 IEP proposed that K.P. would continue

16  to receive 100 minutes of special education per day, 5 days per week; two 30-minute

17  speech/language sessions per week; and 50 minutes of speech/language consultation.  (AR 996).

18  But, whereas prior IEPs designated K.P.'s special education program as "Special Day Class"

19  (SDC), the April 2006 IEP designates K.P.'s special education as "Resource Specialist Program"

20  (RSP).  (Id.).  According to the District, the SDC designation signified that a student was in

21  special education class for more than half the school day.  The RSP designation, on the other hand,

22  referred to students who spent less than half the school day in special education class.  (AR

23  1912:15-24, 2619:1-14).  Thus, says the District, it was the number of minutes that a student spent

24  in special education class that determined a student's categorization, not the other way around;

25  and, an SDC student would not, simply by virtue of her categorization, be entitled to any more

26  special education services than an RSP student.  (AR 1912:18-1913:15, 2619:1-14).

27          As discussed above, K.P.'s May 2005 IEP prepared by WUSD categorized K.P. as an SDC

28  student, even though the IEP placed her in special education classes for less than half the school

United States District Court
Northern District of California

1    day.  The District says that K.P.'s designation as SDC therefore was an error, and it corrected her

2    classification in the April 2006 IEP to RSP.  (AR 996, 1912:25-1913:10, 1914:13-19, 2621:11-

3    2622:7).  K.P., however, remained in the same classes and continued to receive the same services

4    as before.  (AR 2620:18-2621:10).

5          In any event, the District says that by late spring 2006, the SDC and RSP designations

6    were obsolete because both designations were replaced with "Specialized Academic Instruction"

7    (SAI).  This change, says the District, was due to a statewide change in the designation schools

8    were to use for all special education students.  (AR 2619:15-2620:20).  Thus, the District says that

9    when the April 2006 IEP meeting was continued to May, K.P.'s RSP designation was crossed out

10   and changed to SAI.  (AR 996, 2619:15-2620:13).

11         The April 2006 IEP maintained some of K.P.'s goals and objectives and revised and

12   expanded others.  Her math goal (previously limited to consumer math and basic computation)

13   was changed to a goal for solving algebraic equations and graph linear equations.  (AR 1000,

14   1014).  A new writing goal was set for development of an essay.  (AR 1001).  The IEP added a

15   social interaction goal of displaying appropriate behavior in the classroom, hallways, before and

16   after school and during lunch.  (AR 1002).  The IEP maintained her study skills and speech and

17   language goals.  (AR 999, 1004-05).  The April IEP also included a new transition plan, meant to

18   apply primarily to K.P.'s sophomore year, to help prepare her for life after high school.  (AR

19   1008).  Thus, the transition plan provided for exploring career options, community involvement,

20   and graduation requirements.  (AR 2641:13-2643:2).  Additionally, the IEP states that K.P. would

21   be provided with assistance in her regular education classes.  Mother also requested a change in

22   K.P.'s case carrier, and Jennifer Fanoe would be K.P.'s case carrier for the 2006-2007 school year.

23         The IEP meeting was concluded on May 31, 2006.  (AR 998).  Mother says she did not

24   approve the April 2006 IEP because she disagreed with the change in K.P.'s designation from

25   SDC to SAI.  (Opening Brief at 8).

26         Shortly after, the District received a letter from Mother, stating that she understood that

27   K.P.'s health plan would be updated, an aide would be provided in all of her regular education

28   classes, and that the IEP team would meet about six weeks into the new school year to review

1   K.P.'s progress and "to refine the goals and objectives, if necessary." (AR 1056).  Mother added

2   that she was "not comfortable changing [K.P.]'s SDC designation but will be happy to revisit this

3   issue during the upcoming school year."  (Id.).  The District says that because Mother's June 7

4   letter did not raise any objections to the IEP's goals and objectives, and because the letter stated

5   that the parties would meet in the fall "to refine the goals and objectives, if necessary," it

6   understood Mother's letter to mean that Mother agreed to the goals and objectives in the April

7   2006 IEP, subject to a meeting in the fall to review them.  And so, it proceeded to implement those

8   goals and objectives.  (AR 2625:9-2626:8).

9         At some point in 2006, K.P. was caught marking graffiti on District property.  She was

10   made to clean it and was never caught marking graffiti again.  (AR 1705:9-22).

11         **C.      2006-2007 School Year**

12         During her sophomore year at SHS, K.P. continued with a special education individual

13   studies class and was placed in a special education algebra class, which covered in two years the

14   material taught in one year in regular algebra class.  She was placed in regular education English,

15   health, history, science, and physical education.  K.P. also continued to participate in the social

16   skills group for 30 minutes per week; to receive 30 minutes of one-on-one speech/language

17   therapy per week; and to receive 50 minutes of speech/language consultation services per month.

18         On September 12, 2006, the District sent notice of an IEP meeting to be held on September

19   26.  Because Parents' attorney was unavailable on that date, Mother asked that the meeting be

20   rescheduled to November 2 or 6.  The IEP meeting was re-set for November 6, 2006.  (AR 67-68,

21   1089).

22         Meanwhile, K.P. was struggling in her regular education English class and was receiving a

23   D.  So, on September 26, District staff including Jones-Powers, Fanoe, Marlene Hlebo (one of

24   K.P.'s instructional aides) and John Miller (K.P.'s English teacher) met to discuss ways to help

25   her.  Staff agreed to provide K.P. with additional assistance and modifications, such as providing

26   visual reminders to keep her on-task, frequent checking to ensure that she understood the

27   information being presented, and breaking down information into smaller "chunks" to make it

28   easier for K.P. to understand.  (AR 1103-04).

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### *November 2006 IEP*

At the November 6 IEP meeting, the District discussed the modifications that were made at the staff's September 26 meeting and also presented a progress report re the goals and objectives from the April 19, 2006 IEP. A goal was added to have K.P. join an extracurricular school club to address social and transitional skills. The team also discussed having K.P. use a highlighter on tests, that K.P. would be given a second set of textbooks that she could use at home, and Mother's request that a one-on-one aide accompany K.P. at all times to ensure K.P.'s safety. Mother did not sign the IEP because she did not agree with the change in K.P.'s designation from SDC to SAI. (AR 1092-1121, 1701:8-14). The District maintains that the change in K.P.'s designation to SAI was a change in name only and had no substantive impact on her program or services.

The District continued to implement the goals and objectives in the April 19, 2006 and November 6, 2006 IEPs. With Mother's consent, K.P. joined the Future Farmers of America per the added goal of having K.P. participate in an extracurricular club.

In December 2006, at Mother's request, Rita Rispoli, one of K.P.'s private educational therapists and consultants, observed K.P. in her math, English, history, and individual studies classes. According to Rispoli, K.P. was distracted in classes and required constant redirection; she had difficulty starting assignments; doodled instead of taking notes or working; tended to imitate rather than initiate behavior; and did not have much interaction with other students. (AR 1122-26). K.P.'s teachers testified that Rispoli did not speak with them about K.P. or her work. Additionally, they believed that K.P. knew that she was being observed because Rispoli sat very close to K.P. and Rispoli's presence caused K.P. and other students in the classroom to behave differently than they ordinarily would. (AR 1975:17-1976:10, 2483:21-2486:8, 2578:9-2581:7, 2717:22-2718:16).

### *March 2007 IEP*

IEP meetings were held on March 13 and 28, 2007. The IEP did not include any changes to KP's placement; included 11 annual goals for writing, math, organization, transition, reading comprehension, problem solving and receptive/expressive/pragmatic language; and provided that KP would take a vocational skills assessment to help identify her strengths and interests.

1   (AR1172-1205, 2455:6-16, 2469:5-2470:18, 2673:5-18).

2           At the March 13 meeting, the IEP team reviewed K.P.'s first semester grades.  She

3   received an A in science, health, and individual studies; a B in history; and a C in algebra and

4   English.  By the time of the March 13 meeting, however, K.P., who was caught twice cutting

5   classes and was not doing her classwork, had an F in algebra and a C- in English.  Staff reported

6   that K.P.'s social behaviors seemed age appropriate, but a bit on the immature side; she hung

7   around with a group of kids at lunch; in individual studies class, K.P. sat with another girl and they

8   sometimes worked on math together; and in general education classes, K.P. was quiet and did not

9   seek interaction, but was responsive to her peers and teachers.  (AR 1129).  Curnow, K.P.'s

10  speech/language therapist, reported that K.P. had improved in identifying parts of an essay, but

11  still had difficulty extracting information from her reading and organizing that information in her

12  essays.  Curnow also noted that while K.P. still had attention problems and tended to rush through

13  her assignments, her focus had improved.  And, in Curnow's opinion, K.P.'s performance on a

14  task and quality of work was proportionally related to her willingness to do well, noting that when

15  K.P. was interested in an activity, she would stay focused for a long time and participate in

16  discussion extensively.  (AR 1130-31).

17          The District revised K.P.'s goals based on the March 13 meeting, and the IEP meeting was

18  re-convened on March 28 to review them.  The written expression goal from the April 19, 2006

19  IEP was broken down into smaller parts, designed to have K.P. outline a paragraph, write an 8-10

20  sentence paragraph, and prepare an essay of 3 or more paragraphs.  A pragmatic language goal

21  was added whereby K.P. would keep a log of her actions and the social consequences of those

22  actions.  Proposed speech and language goals were designed to have K.P. read passages, extract

23  essential details, and express her opinions and convey her ideas when answering questions.  Math

24  goals included solving addition, subtraction, multiplication, and division problems with 80%

25  accuracy, as well as solving single variable algebraic equations with 80% accuracy.  An

26  organization/transition goal required K.P. to use an academic calendar for assignments and to

27  maintain a notebook for each subject area.  The meeting notes state that Mother and the District

28  disagreed about K.P.'s abilities.  (AR 1159).  Mother did not sign this IEP.

United States District Court
Northern District of California

14

United States District Court
Northern District of California

1    In March 2007, K.P. took the CAHSEE for the first time.  Although she did not pass, K.P.

2   did pass the written essay component of the exam, and obtained a score of 333 on the language

3   arts section, 17 points short of the 350 points required to pass.  She also obtained a score of 306 on

4   the math portion, again with 350 points required to pass.

5    As noted, K.P. was caught twice cutting classes.  She was made to attend two Saturday

6   school sessions as a consequence, and she did not cut classes again.  (AR 2482:11-24).

7    The District says that it over the course of the year, it provided K.P. with a number of

8   modifications and accommodations.  Fanoe, now K.P.'s case carrier, also regularly consulted with

9   K.P.'s teachers and aides.  K.P. was given preferential seating, extra time on tests, and shortened

10  English assignments.  (AR 2516:13-17, 2566:18-2567:5, 2683:23-24, 2685:14-15, 2696:1-

11  2697:15).  Her regular education teachers used repetition and various types of multimodal

12  instruction.  (AR 2436:3-2438:5, 2683:21-2684:20, 2691:6-14, 2704:9-2705:4).  Instructional

13  aides worked with K.P. in her regular education classes and made sure she was on-task, redirected

14  her as necessary, and checked that K.P. understood the material and her work.  (AR 2684:24-

15  2685:6, 2685:11-22, 2696:1-11, 2697:16-2698:8, 2753:19-24).

16   Additionally, the District considered Dr. Wolk's 2005 assessment and implemented a

17  number of her recommendations.  (See, e.g., AR 2503:5-2522:15).  However, the District declined

18  to implement recommendations to limit K.P.'s program to living skills and basic consumer math,

19  because it believed those recommendations underestimated K.P.'s abilities and would have kept

20  her from graduating with a regular diploma.  (AR 1944:14-1945:5, 1952:10-22, 2447:7-10).

21   By the end of the year, K.P. received a C in algebra; a B in English, history, and health;

22  and an A in science and individual studies.  (AR 1232).  According to the District, K.P.

23  maintained a 3.0 grade point average and also met her social interaction and transition skills goals,

24  one of her speech/language goals, two of her short-term study skills goals, as well as her written

25  expression goal (with assistance).  (AR 1195-96, 1198, 1232).

26   K.P. did not return to SHS for the 2007-2008 school year.  Instead, in September 2007,

27  Parents placed her at Riverview, a private residential school for learning disabled children in

28  Massachusetts.

15

1    K.P. initiated an administrative proceeding, claiming that the District failed to provide her

2    with a FAPE.  Following six full days of hearing, at which seventeen witnesses were called, the

3    ALJ issued a detailed 51-page, single-spaced decision adverse to K.P.

4    This appeal followed.

5    K.P. seeks an order setting aside the ALJ's decision; finding that the District did not

6    provide a FAPE for the school years in question; requiring the District to reimburse her for the

7    private placement at Riverview ($63,000 per year) plus associated travel and visitation costs;

8    awarding her attorney's fees and costs as a prevailing party in the underlying administrative

9    action; and awarding her attorney's fees and costs in bringing and prosecuting this appeal.

10   For the reasons discussed below, K.P.'s petition is denied.

11                                    **STANDARD OF REVIEW**

12   In actions brought before the district court pursuant to 20 U.S.C. § 1415, the court's

13   inquiry is twofold:   (1) Has the State complied with the procedures set forth in the IDEA? and (2)

14   is the IEP developed through the IDEA's procedures reasonably calculated to enable the child to

15   receive educational benefits?  <u>Rowley</u>, 458 U.S. at 206-07.  "If these requirements are met, the

16   State has complied with the obligations imposed by Congress and the courts can require no more."

17   <u>Id.</u> at 207.

18   In such actions, the IDEA provides that the court "(i) shall receive the records of the

19   administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii)

20   basing its decision on the preponderance of the evidence, shall grant such relief as the court

21   determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  "Thus, judicial review in IDEA cases

22   differs substantially from judicial review of other agency actions, in which courts generally are

23   confined to the administrative record and are held to a highly deferential standard of review."  <u>Ojai</u>

24   <u>Unified Sch. Dist. v. Jackson</u>, 4 F.3d 1467, 1471 (9th Cir.1993).  At the same time, however, the

25   preponderance of the evidence standard "'is by no means an invitation to the courts to substitute

26   their own notions of sound educational policy for those of the school authorities which they

27   review.'"  <u>Capistrano Unified Sch. Dist. v. Wartenberg</u>, 59 F.3d 884, 891 (9th Cir. 1995) (quoting

28   <u>Rowley</u>, 458 U.S. at 206).

United States District Court
Northern District of California

1    Additionally, courts must give "due weight" to the state administrative proceedings. Van

2    Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J, 502 F.3d 811, 817 (9th Cir. 2007).  How much

3    deference to give state educational agencies is a matter within the court's discretion. Wartenburg,

4    59 F.3d at 891.  Particular deference should be accorded where the administrative findings are

5    "thorough and careful," Capistrano, 59 F.3d at 891, or are based on credibility determinations of

6    live witnesses, Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist., 267 F.3d 877, 889 (9th Cir.

7    2001).  The party challenging a prior administrative ruling---here, K.P.---bears the burden of

8    persuasion.  See Clyde K. v. Puyallup Sch. Dist. No. 3, 35 F.3d 1396, 1399 (9th Cir.1994),

9    superceded by statute on other grounds, as recognized in Capistrano Unified Sch. Dist., 556 F.3d

10   at 900.

**DISCUSSION**

12   K.P. challenges the ALJ's procedural ruling that her claims pertaining to the May 2005

13   IEP were time-barred.  As for his substantive rulings, K.P. contends that the ALJ erred

14   fundamentally by applying the incorrect legal standard.  Application of the correct standard, K.P.

15   argues, compels a ruling in her favor as to (1) the dispute over the change in her classification

16   from SDC to SAI; (2) alleged problems in her program and placement; and (3) the development of

17   an appropriate transition plan.

18   **A.  Statute of Limitations Issue:   May 24, 2005 IEP**

19   The IDEA imposes a two-year statute of limitations.  20 U.S.C. § 1415(f)(3)(C) ("A parent

20   or agency shall request an impartial due process hearing within 2 years of the date the parent or

21   agency knew or should have known about the alleged action that forms the basis of the complaint .

22   ..."); see also Cal. Educ. Code § 56505(l) (requiring a request for a due process hearing to be filed

23   "within two years from the date the party initiating the request knew or had reason to know of the

24   facts underlying the basis for the request.").  In his decision, the ALJ concluded that K.P. could

25   not raise any challenge to the time period from the beginning of the 2005-2006 school year

26   through October 25, 2005 because (a) the May 2005 IEP developed by WUSD was in effect

27   during that time period; and (b) K.P.'s challenge to that IEP fell outside the two-year statute of

28   limitations.  (AR 1283-84).

United States District Court
Northern District of California

1        K.P. concedes that she cannot challenge any development or drafting errors in the May

2   2005 IEP because they fall outside the limitations period.  However, she argues that whether that

3   IEP provided a FAPE in its implementation during August-October 2005 is within the limitations

4   period and therefore should have been considered by the ALJ.

5        As presented to the ALJ, however, K.P.'s challenge to the May 2005 IEP was based on

6   alleged deficiencies in that IEP as written.  Specifically, she claimed that the May 2005 IEP was

7   not based on relevant information about her deficits, failed to give due weight to available

8   information from prior assessments, failed to properly address all of her deficits, failed to address

9   safety concerns, and did not have an appropriate transition plan.  (Osher Decl., Ex. A (TAC at

10  4:19-22, 6:6-11).

11       The ALJ properly concluded that K.P.'s claims re the May 2005 IEP are time-barred.

12  Mother signed her consent to the May 2005 IEP and initialed the plan to indicate that she received

13  a copy of a document advising as to parents' and child's procedural due process rights and that

14  these rights were explained to her.  (AR 859).  Mother therefore knew or should have known about

15  any deficiencies in the IEP as of that date.  See, e.g., Miller v. San Mateo-Foster City Unified Sch.

16  Dist., 318 F. Supp.2d 851, 860-62 (N.D. Cal. 2004) (concluding that the parents' claims were

17  time-barred where the record showed that they properly were apprised of their due process rights,

18  but failed to take timely action after they learned or had reason to suspect that the District

19  incorrectly assessed that their son was not disabled).

20       As for the 2005-2006 school year, K.P. claimed that she was denied a FAPE because she

21  was placed in an RSP program with regular education classes; her classrooms were too crowded

22  for her learning needs; she was denied accommodations and modifications; and her teachers

23  artificially inflated her grades.  (Osher Decl., Ex. A (TAC at 6:12-16).  The challenge to her RSP

24  placement is an attack on the IEP as written; and, as discussed above, the ALJ properly concluded

25  that issue was time-barred.

26       As for the remaining issues, at no time did the ALJ state that he was limiting his analysis to

27  the period after October 25, 2005.  And, in addressing K.P.'s claims the ALJ considered each of

28  the school years at issue in their entirety, including events that occurred between August and

United States District Court
Northern District of California

18

1    October 2005.  (See, e.g., AR 1284-86, 1314, 1318-27).  Accordingly, this court finds no basis to

2    conclude that the ALJ improperly refused to consider issues.

3          K.P. nonetheless argues that the District failed to develop goals and get a speech

4    assessment done.  As discussed above, the record demonstrates that throughout the Fall of 2005,

5    the District made repeated requests for Parents' consent to assess K.P., but Mother would not

6    consent to any assessments until after Dr. Wolk completed hers.  (AR 1319, 1956:18-1961:11,

7    880, 884, 889, 893, 912-17, 922-23, 1590:13-21, 1683:8-24).

8          The court finds no error here.

9          **B.     Whether the ALJ Used the Correct Standard**

10          K.P. argues that, in determining whether she was denied a FAPE, the ALJ applied the

11   wrong legal standard because he referred to the "some" educational benefit standard, rather than

12   the "meaningful" educational benefit standard.  As discussed, she contends that application of the

13   "some" benefit standard was a fundamental error that tainted the ALJ's analysis as to (1) the

14   dispute over the change in her classification from SDC to SAI; (2) alleged problems with her

15   program and placement; and (3) the development of an appropriate transition plan.

16          In Rowley, the U.S. Supreme Court held that providing a FAPE does not require states to

17   maximize the potential of each disabled student commensurate with the opportunity provided to

18   nondisabled students.  Rather, states are to provide disabled students with "a basic floor of

19   opportunity" that is "sufficient to confer some educational benefit" upon the disabled child.

20   Rowley, 458 U.S. at 200.  The Ninth Circuit has confirmed that "*Rowley* continues to set the free

21   appropriate public education standard."  Mercer Island Sch. Dist., 592 F.3d at 941.  Although there

22   previously was some confusion in the Ninth Circuit as to whether the IDEA requires school

23   districts to provide "some" educational benefit or "meaningful" educational benefit, the Ninth

24   Circuit has clarified that the terms "some educational benefit," and "meaningful educational

25   benefit" refer to the same standard as discussed in Rowley.  Id. at 951 n.10.  The ALJ therefore did

26   not err with respect to the applicable legal standard.

27          **C.  K.P.'s placement**

28          As discussed, K.P. initially was classified as an SDC student, even though she had always

1   been in special education classes for less than half the school day.  Her student designation

2   subsequently was changed to RSP to reflect that; and in her April 2006 IEP, her designation was

3   changed to SAI pursuant to a mandate from the state.  The ALJ concluded that the District did not

4   deny a FAPE by changing K.P.'s designation from SDC to SAI because that change had no impact

5   on the educational services K.P. actually received (AR 1300, 1302, 1322).

6          K.P. says that the District's use of the SDC designation led Parents to believe that she was

7   an SDC student when the District was providing only RSP services.  Here, she states that the

8   reason Mother did not sign the April 2006 IEP was because she "didn't agree with the change in

9   designation from SDC to [SAI] as the District proposed," believing it would lead to a "reduction

10  in the level of special education services and she had consistently been asking for an increase in

11  special education services and placement."  (Opening Brief at 8:17-18, 16:15-17).  She further

12  argues that the District improperly changed her designation to SAI without parental consent; and,

13  she contends that pursuant to California Education Code § 56346(f), the District improperly failed

14  to file for an administrative hearing to resolve the issue.

15         The evidence of record demonstrates that even after K.P.'s designation was changed, she

16  continued to receive exactly the same services as before---namely, 100 minutes of special

17  education classes per day, two 30 minute speech/language sessions per week, and 50 minutes of

18  speech/language consultation per month.  (AR 996).  Thus, K.P. has not managed to persuade that

19  the District was required to file for an administrative hearing pursuant to California Education

20  Code § 56346.  That statute requires a school district to file for a due process hearing if it

21  "determines that the proposed special education program component to which the parent does not

22  consent is necessary to provide a free appropriate public education to the child . . .."  Cal. Educ.

23  Code § 56346(f).  As explained by the District, the change from SDC to SAI was a change the

24  state required schools to make for all special education students; and, the change had absolutely no

25  effect on the K.P.'s educational program and placement.  (AR 2619:15-2620:20).

26         To the extent K.P. seems to suggest that she should have been placed in more special

27  education classes or that her entire curriculum should have been in special education, the IDEA

28  requires that the IEP allow the disabled student to receive an education in the "least restrictive

United States District Court
Northern District of California

1   environment." 20 U.S.C. § 1412(a)(5)(A).  As discussed above, this means that school districts

2   must ensure that, to the maximum extent appropriate, a student with disabilities is educated with

3   nondisabled students, unless "the nature or severity of the disability of a child is such that

4   education in regular classes with the use of supplementary aids and services cannot be achieved

5   satisfactorily."  Id.; 34 C.F.R. § 300.114.  For the reasons to be discussed, the ALJ did not err in

6   concluding that K.P. received educational benefit at SHS.

7         **D.      Aide Support**

8         In the administrative proceedings, K.P. contended that the District did not adequately train

9   her instructional aides.  Mother also expressed concern that one of K.P.'s aides did not have

10  sufficient English-speaking skills.  The ALJ found no credible evidence that the aide could not be

11  understood.  And, crediting the testimony of K.P.'s teachers, case carriers, and aides, the ALJ

12  concluded that the evidence did not establish that the District failed to adequately train K.P.'s

13  instructional aides or that the aides failed to provide her with necessary assistance.  (AR 1312).

14  K.P. does not directly challenge that conclusion here.

15        Instead, as this court understands it, K.P. now argues that she should have been permitted

16  to challenge aide services that she received in her regular education classes, but which were not

17  documented in the October 2005 or January 2006 IEPs.  In his decision, the ALJ found that the

18  District provided K.P. with aide services in her regular education classes, even though it did not

19  list an instructional aide as a service on either the October 2005 IEP or January 2006 IEP.  (AR

20  1292, 1312).  Such aide service apparently was expressly stated for the first time in the April 2006

21  IEP.  (AR 1312).  The ALJ noted, however, that KP "did not allege in her Complaint that the

22  District committed a procedural violation by failing to document in [KP's] IEP the instructional

23  aide support."  (AR 1292 n.6).

24        K.P. does not dispute that the undocumented aide issues were not raised in her complaint.

25  The District correctly notes that the party requesting the due process hearing (here, K.P.) may not

26  raise issues at the hearing that were not raised in the complaint, unless the other party otherwise

27  agrees.  20 U.S.C. § 1415(f)(3)(B); Cal. Educ. Code § 56502(i).  And, generally, matters must be

28  administratively exhausted before judicial review is available.  20 U.S.C. § 1415; Doe v. Arizona

United States District Court
Northern District of California

1 Dep't of Ed., 111 F.3d 678, 680-81 (9th Cir. 1997).  The ALJ properly barred this issue.

2      K.P. nonetheless argues that she should have been permitted to raise this issue because she

3 did not realize until the due process hearing that the District had provided undocumented aide

4 support.  The District says that this is all too little, too late.  It points out that an October 2006

5 letter establishes that Mother was aware K.P. was receiving aide support.  Further, the District

6 argues that K.P. could have pursued subpoenas in connection with the due process hearing and

7 also had the right to discovery pertaining to her student records.  K.P. says that no amount of

8 discovery would have revealed the undocumented provision of such services.

9      Even assuming the ALJ was not precluded from considering the issue, this court finds no

10 basis to grant K.P.'s petition as to this issue.  K.P. surmises that the District did not document the

11 aide support to make it seem like she was more high functioning than she is and to obscure her

12 actual performance at SHS.  The upshot, says K.P., is that if the ALJ had applied the "meaningful

13 benefit" standard, then he would have concluded that the District's assertions as to her

14 performance levels were inaccurate, unless they stated that K.P. could perform at that level with

15 aide support.  As discussed above, the ALJ did not err with respect to the applicable legal

16 standard.  In any event, the ALJ's decision indicates that he was fully cognizant of the

17 undocumented aide support and took that into account when determining whether K.P. received a

18 FAPE.  (See, e.g., 1300, 1312-14, 1319).

19      K.P.'s petition as to this issue is denied.

20      **E.      Educational Benefit at SHS**

21      K.P. contends that, in concluding that she was making progress at SHS and received

22 educational benefit there, the ALJ improperly glossed over the shortcomings in her performance.

23 The overarching problem, she says, is that the ALJ applied the wrong legal standard.  For the

24 reasons discussed above, that argument is rejected.

25      K.P. also argues that the ALJ put too much stock in her grades, which she claims were

26 inflated to make it look like she was succeeding.  K.P., however, has cited no evidence to support

27 the allegation of grade inflation, which appears to be based solely on Mother's belief that K.P.

28 could not perform as well as her grades suggested.  (AR 1706:15-21).  K.P. contends that if the

United States District Court
Northern District of California

22

United States District Court
Northern District of California

1   ALJ was correct that she functioned in the low average range, then her grades should have been

2   those of a low average student, i.e., C's and D's, not A's and B's.  But, she has not cited any

3   evidence suggesting that grades correlate directly to IQ.  Moreover, a number of K.P.'s teachers

4   testified about how they evaluated K.P.'s work and stated that they did not inflate her grades and

5   that she earned the grades reflected in her transcript.  (AR1942:4-19, 1949:3-8, 2570:11-16,

6   2686:1-2687:3, 2701:5-2703:11, 2758:6-22).  The ALJ did not err in crediting that testimony.

7   (AR 1313-14).

8           K.P. nevertheless contends that her grades are not an accurate reflection of her actual

9   abilities because the District modified her regular education curriculum and provided her with

10   instructional aides.  She argues that the ALJ erred in assessing her progress at SHS because he

11   failed to properly account for those modifications and that assistance.  Her contention appears to

12   be that the ALJ was somehow duped into believing that she could function in regular education

13   "with little support" and "was sold on a charade of leaving off documentation the assistance the

14   District was providing."  (Opening Brief at 22:13-14).  However, it does not appear that the

15   District has ever taken the position that K.P. could function "with little support."  Nor did the ALJ

16   make such a finding.  Additionally, there is no indication that the District attempted to hide from

17   the ALJ the fact that K.P. received aide support.  To the contrary, K.P.'s case carrier, teachers, and

18   one of her aides testified about the aide support she received.  (See, e.g., AR 2436:17-2438:23,

19   2489:2-7, 2503:18-2504:4, 2696:1-11, 2697:16-2698:8, 2739:13-2741:22, 2753:19-2754:7).  And,

20   as discussed above, the ALJ took into account the modifications and aide support K.P. received,

21   including aide support that was not documented on her IEP.  (See, e.g., 1300, 1312-14, 1319).

22           K.P. maintains that she made no real progress on her goals and objectives, stating that in

23   the two years she was at SHS, she achieved only three or four of eleven or more annual goals and

24   met her written expression goal "with assistance."  Nevertheless, in evaluating K.P.'s performance

25   levels as of March 2007 (shortly before she left the District), the ALJ did not err in concluding

26   that, while K.P. did not achieve all of her goals and objectives, she did make progress.  (AR 1307).

27   For example, although K.P. did not meet her study skills goal (because she was not always writing

28   down her assignments and her school binders were disorganized), she was bringing the required

1    materials to class.  (AR 1193; 2571:23-2572:13).  Additionally, K.P. met her social interaction

2    goal by demonstrating appropriate behavior on campus (AR 1195), and she met her transitional

3    skills goal by joining the Future Farmers of America (AR 1196).  She did not meet her math goal,

4    but the ALJ found that it was not because K.P. was not capable but because she tended to rush

5    through her work without checking for accuracy.  (AR 1307).  That conclusion is amply supported

6    by Haynes' testimony.  Haynes testified that K.P. was capable of doing the work, but he had

7    observed that K.P. tended to rush through her work and make careless errors.  Additionally,

8    Haynes testified that around this time, K.P. had not been coming to class or doing her classwork;

9    but, once she did start doing those things, she did them well.  (AR 1934:1-12, 1972:9-1973:15).

10   While K.P. did not meet her speech/language goals, the ALJ correctly observed that Curnow

11   reported that K.P.'s story retelling had improved and that K.P. did make progress on answering

12   questions after reading a four-paragraph passage.  (AR 1307, 1130-31, 1199).

13          Further, the ALJ noted that although K.P. did not meet her writing goal, she did make

14   significant progress in being able to write a grammatically correct, three-paragraph essay with

15   supporting ideas, with assistance from her instructional aide.  (AR 1307).  Indeed, for her regular

16   English class, K.P. prepared an essay, comparing the novels All Quiet on the Western Front and

17   The Diary of a Young Girl, on the subject of the characters' need for human contact and love, for

18   which she received an A-.  (AR 586-88).  The ALJ correctly noted that there was no indication

19   that K.P. did not write that essay.  (AR 1307).  Indeed, instructional aide Hlebo averred that she

20   did not write the essay for K.P. and helped by getting K.P. to draw pertinent information from the

21   books and to discuss how to organize the information.  (AR 1307, 2744:9-2745:5).  And, as

22   discussed above, K.P. took the CAHSEE for the first time in the spring of 2007, passed the written

23   essay component of the exam, and obtained a score of 333 on the language arts portion of the test,

24   just seventeen points short of the 350 needed to pass.  (AR 1238, 2474:10-14, 2528:19-25).

25          The District correctly notes that K.P.'s teachers testified in detail about K.P.'s goals and

26   objectives.  Additionally, K.P.'s case carriers, teachers, and therapists testified as to the progress

27   they personally observed:

28          Haynes testified that he saw a "dramatic change" in K.P.'s confidence and abilities from

United States District Court
Northern District of California

24

1   the first time she entered his math class to the time she left the District, including the ability to

2   solve simple algebra problems.  (AR 1948:23-1949:2, 1949:9-23).

3           Fanoe testified that while K.P. continued to work on her organizational skills, she was

4   progressing well toward that goal.  Additionally, Fanoe observed that K.P. had made friends at

5   SHS, including regular education students.  (AR 2446:14-21, 2525:24-2526:11).

6           John Miller, K.P.'s regular education English teacher, testified that at the beginning of her

7   sophomore year, K.P. "had about a C grade, which is about average" and that toward the end of

8   the year she "was demonstrating written competence and reading comprehension competence that

9   was in the above average range."  (AR 2700:12-20).

10          Stephen Goodbody, K.P.'s regular education history teacher, testified that K.P.'s work

11  "was at the quality of the majority of the tenth graders, better than average of the tenth graders that

12  I had in tenth grade."  Additionally, Goodbody noted that, over the course of the year, the quality

13  of K.P.'s written work improved, the number of times she was late with her work decreased, and

14  K.P. began working ahead in his class.  (AR 2755:18-2756:7).

15          Speech/language therapist Gisele Curnow testified that K.P. learned from her mistakes and

16  observed that "there was a lot of maturation and growth in her."  (AR 2247:11-2248:7, 2277:10-

17  11).

18          K.P. has not met her burden to show that she did not receive educational benefit at SHS.

19          **F.      Transition Plans**

20          Beginning with the IEP that will be in effect when a special education student reaches 16

21  years of age, an IEP must contain a transition plan with appropriate postsecondary goals based

22  upon age-appropriate transition assessments related to training, education, employment, and where

23  appropriate, living skills.  20 U.S.C. § 1414(d)(1)(A)(i)(VIII); Cal. Educ. Code § 56345(a)(8)(A).

24  K.P. contends that the District failed to prepare an appropriate transition plan that was specific to

25  her needs and that would properly prepare her for life after high school.

26          The May 2005 IEP provided a transition plan.  K.P. contends that the identified goals are

27  too generic to be of any benefit to her and argues that she is entitled to challenge the adequacy of

28  those goals because the essential components of the May 2005 transition plan were carried over to

United States District Court
Northern District of California

25

United States District Court
Northern District of California

1    the January 2006 IEP.  However, insofar as K.P. seeks to challenge the contents of the May 2005

2    IEP, as discussed above the ALJ properly determined that such challenges are time-barred.

3            In any event, as for the remaining transition plans, K.P. does not point to any testimony as

4    to any alleged deficiencies in those plans or how any such deficiencies might have affected her

5    ability to receive a FAPE.  On the other hand, there was considerable testimony from District staff

6    as to the preparation of the transition plans who explained how and why those plans were

7    appropriate for K.P.

8            In December 2005, the District prepared a Vocational Guidance Report for K.P. based on

9    an interview with K.P., her work/school history, assessment test results, and observations of K.P.

10   (AR 162).  The report noted K.P.'s stated interests, skills, and hobbies and stated that K.P. planned

11   to go to a 2-year college and transfer and to work in retail sales after high school and while

12   attending college.  Potential employment interests included police officer, teacher, waitress,

13   painter, and a public relations representative.  Among other things, the report suggested that K.P.

14   explore job opportunities through the Monterey County Youth Employment program, enroll in the

15   SHS Transition Partnership Program during her senior year, participate in community service and

16   volunteer projects, and become a client of the California Department of Rehabilitation for

17   continued supportive services after high school.  (Id.).

18           Jones-Powers testified that the purpose of the Vocational Guidance Report is to get an idea

19   of the student's strengths and interests to assist in future planning re courses to take or

20   occupational programs to explore.  (AR 2613:13-19).  That document was used in developing

21   K.P.'s transition plans.  (AR 2613:20-2614:3).

22           Haynes' testimony established that he took K.P.'s needs and interests into account, as well

23   as his experience with her, when he prepared the April 2006 transition plan.  (AR 1922:22-

24   1923:2).  He read K.P.'s Vocational Guidance Report and had it in mind when he prepared K.P.'s

25   transition plan.  (AR 1987:7-20).  He also spoke with K.P. while developing the plan.  (AR

26   1924:13-1925:6).  And, K.P. attended the IEP meetings where the plan was developed and

27   discussed.  (AR 975, 996).

28           The March 2007 IEP transition plan focused on the end of K.P.'s sophomore year and the

majority of her junior year.  Fanoe, who prepared that plan, spoke with K.P. while preparing it and incorporated K.P.'s stated interest in retail sales.  (AR 2468:15-2469:1).  Fanoe testified that the plan was designed to help K.P. take responsibility and ownership of graduation requirements, explore possible post-high school career options (including by being involved in the community through community service, a graduation requirement), and research various post-high school living skills, such as cooking, cleaning, paying bills, and managing a budget.  (AR 2469:15-2470:18).

K.P. has not cited any evidence or testimony to the contrary.  Instead, she argues that she never actually met the goals set in the May 2005 IEP transition plan and that the District had to extend those goals into the 2006-2007 school year.  But, even assuming that the transition plans were deficient, K.P. has failed to show that reimbursement for placement at Riverview would be an appropriate remedy for the alleged failure to prepare or implement an appropriate transition plan.  To obtain reimbursement, K.P. must prove that the private placement was appropriate.  34 C.F.R. § 300.148(c).  As noted by the ALJ, the testimony of Maureen Brenner, Riverview's Head of School, established that K.P. did not have an individualized transition plan at Riverview and that Riverview students do not enroll in the school's vocational program until after their senior year.  (AR 1316, 2306:19-20, 2338:12-19).

K.P.'s petition as to this issue is denied.

### ORDER

Based on the foregoing, K.P. petition for an order setting aside the ALJ's decision is denied.  The clerk shall enter judgment for the defendant and close the file.

SO ORDERED.

Dated:  April 8, 2016

_____

HOWARD R. LLOYD
United States Magistrate Judge

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

5:08-cv-03076-HRL Notice has been electronically mailed to:

Bob N. Varma     bvarma@varmaclancy.com, raiderbobv@yahoo.com

Daniel Andrew Osher     dosher@lozanosmith.com

Geralyn Marie Clancy     gclancy@clancylegal.com

Gregory Alan Wedner     gwedner@lozanosmith.com, ploftis@lozanosmith.com, ssimmons@lozanosmith.com